STATE OF CONNECTICUT *v.* ANGELO JOYNER
(14349)

PETERS, C. J., BORDEN, BERDON, NORCOTT and SANTANIELLO, Js.

Argued December 2, 1992—decision released May 4, 1993

*Neal Cone,* assistant public defender, with whom, on the brief, were *G. Douglas Nash,* public defender, and *Kent Drager,* assistant public defender, for the appellant (defendant).

*Mary H. Lesser,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, *James Clark,* assistant state's attorney, and *John P. McKinney,* law student intern, for the appellee (state).

PETERS, C. J. The principal issue in this criminal appeal is whether a statute imposing on the defendant in a criminal prosecution the burden of establishing the defense of mental disease or defect violates the due process provisions of the Connecticut constitution. The state charged the defendant, Angelo Joyner, with one count of kidnapping in the first degree, in viola-

tion of General Statutes § 53a-92 (a) (2) (A); one count of assault in the first degree, in violation of General Statutes § 53a-59 (a) (1); and three counts of sexual assault in the first degree, in violation of General Statutes § 53a-70 (a) (1).[1] A jury found the defendant guilty of all the crimes charged, and the trial court sentenced him to a term of imprisonment of fifty years. He appeals to this court pursuant to General Statutes § 51-199 (b) (3). We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The victim and her two and one-half year old daughter lived in an apartment in New Haven. On the evening of March 2, 1989, the victim invited a number of neighbors and the defendant to her apartment. After the other visitors had left, the victim asked the defendant also to leave, but he refused to do so.

The defendant told the victim that he wanted to have sex with her. When she refused, he began to hit her and threatened to kill her daughter, who was asleep in an upstairs bedroom. He forced the victim to perform fellatio and penetrated her, vaginally and anally.

---

[1] General Statutes § 53a-92 provides in relevant part: "KIDNAPPING IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

General Statutes § 53a-59 provides in relevant part: "ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

General Statutes § 53a-70 provides in relevant part: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

Whenever she refused his sexual advances, he struck her again, both with his fists and with a stick, and continued his sexual assaults. As a result of the defendant's assaults, which included choking the victim, she temporarily lost consciousness. The assaults continued throughout the night.

Early on the morning of March 3, 1989, two police officers went to the apartment in response to a complaint of screaming. Upon their arrival, they heard a woman repeatedly crying out for help. The defendant appeared in an upstairs window, but refused the officers' request to open the door. After breaking down the door to gain entry, they told the defendant to come downstairs. The defendant first refused, threatening to kill the police officers with a gun, but he ultimately allowed the child to go downstairs and then went down himself, holding the victim. The defendant and the victim were nude and covered with blood. The victim's face was swollen to twice its normal size. She could barely speak and was gasping for breath. The defendant had no visible injuries. Police inspection of the apartment disclosed the presence of bloodstains on the furniture and on the floor of numerous rooms.

Medical examinations of the victim revealed severe facial trauma, as well as a broken rib, and possibly a bruised kidney. The pattern of her injuries demonstrated that they had resulted from a beating and not from an accidental fall down a staircase.

The state toxicologist analyzed vaginal and anal smears taken from the victim and discovered the presence of sperm. This scientific evidence was consistent with the victim's immediate complaints of sexual assault, both to an examining gynecologist and to a police officer.

The defendant did not deny his presence at the victim's apartment. Without testifying himself, he offered

a twofold defense through the testimony of his psychiatrist. On the one hand, the defendant relied on his statements to the psychiatrist that the victim was an alcohol and drug abuser and that she and the defendant had been smoking crack cocaine together on the night of the incident. The defendant claimed that their sexual relations had been consensual until the victim had become enraged at his disclosure that he was leaving her for another woman. He attributed her wounds to a fall down a flight of stairs. On the other hand, the defendant also offered the psychiatrist's diagnosis that the defendant was psychotic and suffered from a schizoaffective disorder that caused him to have disturbed thinking, delusions of persecution and hallucinations.

The jury found the defendant guilty as charged. The trial court denied the defendant's motions for a new trial and for acquittal and rendered judgment in accordance with the jury verdict.

The defendant has raised seven issues in his appeal to this court. He maintains that the trial court improperly: (1) denied his motion for acquittal of assault in the first degree; (2) imposed upon him the burden of establishing his insanity, pursuant to General Statutes § 53a-13 (a), in violation of the due process provisions of article first, §§ 8 and 9 of the Connecticut constitution; (3) failed to give a sua sponte curative instruction to the jury in response to a prejudicial rebuttal argument by the state's attorney; (4) admitted prior misconduct evidence; (5) refused to make an in camera inspection of privileged records of the victim; (6) permitted the state's psychiatrist to testify that the defendant had been in control of his conduct; and (7) deprived him of his constitutional right to testify. We are unpersuaded by any of these claims.

## I

The defendant's first contention is that the state adduced insufficient evidence to sustain his conviction of assault in the first degree. In its long form information, the state charged that the defendant had committed first degree assault, as defined by § 53a-59 (a) (1), by intentionally causing serious physical injury to the victim "by means of a dangerous instrument; to wit: a piece of wood." The defendant maintains that even if the jury could reasonably have found that he had inflicted serious physical injury upon the victim, it could reasonably have determined only that he had done so with his fists and not with a wooden stick. The defendant raised this issue in the trial court by filing a motion for acquittal, which the trial court denied.

This court's review of claims relating to the sufficiency of the evidence to sustain a criminal conviction is governed by a well established standard of law. "Whether we review the findings of a trial court or the verdict of a jury, our underlying task is the same. . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); see also *State* v. *Crosswell,* 223 Conn. 243, 249, 612 A.2d 1174 (1992); *State* v. *Roseboro,* 221 Conn. 430, 434, 604 A.2d 1286 (1992). Applying that standard in this case, we conclude that the evidence presented by the state could reasonably have persuaded the jury, beyond a reasonable doubt, that the defendant had committed the crime of assault in the first degree.

The stick with which the defendant beat the victim was a wooden stick ordinarily used to keep a window in the apartment shut. The defendant does not deny that the victim testified that she had been hit with this stick, or that the jury might reasonably have found the stick to be a dangerous instrument. He focuses, instead, on the victim's testimony that the majority of the beating was done with the defendant's fists. He also points to the absence of direct evidence concerning the place on the victim's body where she had been hit with the stick or the severity of these blows. Without such direct evidence, he maintains, the jury's verdict that he had inflicted serious physical injury on the victim with the stick was speculative and must, therefore, be set aside.

The term "serious physical injury" is defined by General Statutes § 53a-3 (4) as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." When the evidence supports a finding that a beating with fists and with a stick, in combination, caused such serious impairment to the health of a victim as to render her unconscious, it is not necessary for the victim to be able to recall with precision what blows caused her injuries. Although the victim could not remember how often the defendant had hit her with the stick, she did recall that he had hit her with the stick at least once. She also testified that the defendant had stood over her, stick in hand, while she was lying on her back, before she lost consciousness. The jury could infer from this testimony, in conjunction with its examination of the stick, which was in evidence, that the state had proved assault in the first degree beyond a reasonable doubt.

## II

The defendant's second contention is that he is entitled to a new trial because the trial court improp-

erly instructed the jury, in accordance with General Statutes §§ 53a-12 and 53a-13,[2] that he bore the burden of establishing the existence of his claimed mental disease or defect by a preponderance of the evidence. His claim is not that the trial court misconstrued or misapplied these statutes, but rather that, in making mental disease an affirmative defense on which the defendant bears the burden of proof, § 53a-13 (a), as amended in 1983, violates the due process clauses contained in article first, §§ 8 and 9 of the Connecticut constitution.[3] We disagree.

The defendant did not object at trial to the trial court's charge assigning to him the burden of proof on mental disease. We have decided to review this claim, nonetheless, because the record is adequate for us to consider it, and because it raises an important and unresolved question of state constitutional law. *State v. Golding,* 213 Conn. 233, 238–41, 567 A.2d 823 (1989);

---

[2] General Statutes § 53a-12 provides in relevant part: "DEFENSES; BURDEN OF PROOF. . . .

"(b) When a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

General Statutes § 53a-13 provides in relevant part: "LACK OF CAPACITY DUE TO MENTAL DISEASE OR DEFECT AS AFFIRMATIVE DEFENSE. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

General Statutes § 53a-13 (a) made mental disease or defect an affirmative defense as a result of a 1983 legislative amendment to that section. Public Acts 1983, No. 83-486, § 1.

[3] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

Article first, § 9, of the Connecticut constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

*State* v. *Barrett,* 205 Conn. 437, 443–44, 534 A.2d 219 (1987); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

The defendant's constitutional argument rests on two overlapping rules of law allegedly mandated by the due process clauses of our state constitution. The defendant's principal but narrower contention is that our due process provisions require the state to prove sanity, once an issue about a defendant's mental status has properly been raised, because the defendant's mental status then becomes one of the elements of the state's case. His alternate but broader contention is that, regardless of whether sanity is an element of the state's case, our due process provisions incorporate principles of fairness, justice and morality that require the state to bear the ultimate burden of proof with respect to sanity.

A

To put the defendant's state constitutional contentions into perspective, it is helpful to examine briefly how federal law has dealt with the issues that he raises. As a matter of federal constitutional law, although due process requires the state to prove every element of its case beyond a reasonable doubt; *Patterson* v. *New York,* 432 U.S. 197, 204, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *Mullaney* v. *Wilbur,* 421 U.S. 684, 698–701, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); a defendant's sanity is not an element of the state's case, so that the state need not bear the burden of proof on that issue. *Patterson* v. *New York,* supra, 205–206; *Leland* v. *Oregon,* 343 U.S. 790, 797–99, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952).[4] The

---

[4] In his reply brief, the defendant alludes for the first time to a claim that General Statutes § 53a-13 (a) may also be unconstitutional as a matter of federal constitutional law. We decline to consider this claim because

Supreme Court of the United States has not addressed any other due process challenge to the validity of statutes requiring a defendant to shoulder the burden of proof on the issue of insanity.

As a matter of state constitutional law, we presume that the due process clauses contained in article first, §§ 8 and 9, incorporate the federal principle that due process requires the state to prove every element of its case beyond a reasonable doubt. We presume also that our due process clauses equally incorporate the federal principle that, as a general matter, "[i]t is constitutionally permissible for the state to place the burden on a criminal defendant to prove by a preponderance of the evidence elements which would constitute an affirmative defense but which do not serve to negate any essential element of the crime which the state has the burden of proving beyond a reasonable doubt in order to convict." *State* v. *Arroyo,* 181 Conn. 426, 430, 435 A.2d 967 (1980); see also *McMillan* v. *Pennsylvania,* 477 U.S. 79, 85–86, 106 S. Ct. 2411, 91 L. Ed. 2d 67 (1986); *Patterson* v. *New York,* supra. Bearing these propositions in mind, we must decide whether, under our state constitution, a defendant's sanity, once put into issue, must be proved by the state as an element of its case or as a result of another applicable constitutional principle. We assuredly have the authority to construe our own due process clauses to afford higher levels of protection for the individual rights of insane persons than those guaranteed by the federal constitution. Cf., e.g., *State* v. *Oquendo,* 223 Conn. 635, 649–50, 613 A.2d 1300 (1992); *State* v. *Marsala,* 216 Conn. 150, 171, 579 A.2d 58 (1990); *State* v. *Dukes,* 209 Conn. 98, 120–23, 547 A.2d 10 (1988).

it has neither been adequately noticed nor adequately briefed. Even in his reply brief, this contention is subsumed under the heading: "The state constitution bars General Statutes § 53a-13's burden of persuasion."

## B

We turn first to the defendant's claim that § 53a-13 (a), as amended, is unconstitutional because, once mental status has been raised as an issue in a criminal prosecution, proof of sanity necessarily becomes an element of the state's case. We agree with the state that the legislature is not foreclosed from making insanity an affirmative defense to be proved by a defendant by a preponderance of the evidence, because we can discover no constitutional requirement that sanity be considered an essential element of the crime to be proved by the state beyond a reasonable doubt.

Our analysis of the defendant's challenge to the constitutionality of § 53a-13 (a), as amended, must take account of two well established postulates. First, in light of the established presumption in favor of a statute's constitutionality, any person attacking the validity of a lawfully enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt. *State* v. *Floyd,* 217 Conn. 73, 79, 584 A.2d 1157 (1991); *State* v. *Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989); *State* v. *Dupree,* 196 Conn. 655, 663, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985). Second, in light of established doctrines implicit in the separation of powers, the primary responsibility for enacting the laws that define and classify crimes is vested in the legislature; *State* v. *Dupree,* supra, 665; *State* v. *Darden,* 171 Conn. 677, 679, 372 A.2d 99 (1976); *State* v. *Rao,* 171 Conn. 600, 603, 370 A.2d 1310 (1976); and such legislative authority includes the responsibility for defining the elements of a crime. See *State* v. *Breton,* supra, 268.

Our inquiry into the constitutionality of § 53a-13 (a), as amended, must also proceed with the recognition that there is an analytic distinction between mental sta-

tus as it relates to the insanity defense and mental status as it relates to intent to engage in criminal conduct. See *State* v. *Jarrett,* supra, 770–73; *State* v. *Hines,* 187 Conn. 199, 204, 445 A.2d 314 (1982); see also *State* v. *Evans,* 203 Conn. 212, 244–45, 523 A.2d 1306 (1987) (*Peters, C. J.,* dissenting). The amended statute shifts to the defendant the burden of establishing his or her mental status only with respect to the affirmative defense of insanity. The statute does not purport to relieve the state of its continuing burden of proof with respect to mental status when mental status is implicated in the state's proof of an element of the crime, such as the defendant's specific intent to commit the crime with which he or she has been charged.

The defendant's principal contention is that, in light of our state due process clauses, this analytic distinction between the purposes for which evidence of mental status may be adduced is irrelevant. It does not matter, in his view, that the legislature has not included sanity as an element of the crime with which he has been charged. He maintains that it is just as unconstitutional for the legislature to shift to him the burden of establishing the defense of insanity as it would be to require him to bear the burden of proof on intent. In either case, he argues, principles of due process in Connecticut mandate the conclusion that, once the issue of mental status has properly been raised, mental status, including both intent and sanity, becomes an element of the crime charged on which the state must bear the burden of proof.[5]

---

[5] We recognize the risk that a jury may have difficulty in understanding the distinction between mental status as it relates to the defense of insanity and mental status as it relates to intent. Whatever risk of confusion may be engendered by this distinction must be addressed by an appropriate jury instruction. The defendant has not challenged the jury instruction given by the trial court in this case.

Article first, §§ 8 and 9, the due process provisions of the Connecticut constitution on which the defendant relies, do not illuminate textually the extent to which a deep seated concern for the protection of personal freedom should be translated into a constitutional command that sanity is an essential element in the state's prosecution of a criminal defendant. Lacking textual guidance, we have looked to the available case law in reasonable temporal proximity to the adoption of the constitution of 1818 to enhance our understanding of the original intent of the constitutional framers. See *State* v. *Lamme,* 216 Conn. 172, 180–81, 579 A.2d 484 (1990).

Pursuing this search for historical meaning, the defendant maintains that Connecticut cases, both in the nineteenth century and more recently, have described the defense of insanity as encompassing sanity within the elements of criminal behavior. These descriptions manifest, according to the defendant, a constitutional understanding about the relationship between sanity and the elements of a crime that the legislature is powerless to overturn.

Although cases in close temporal proximity to the enactment of our constitution in 1818 would have helped to clarify the intent of the framers with regard to the defense of insanity, neither our own research nor that of counsel has uncovered any such cases. Beginning in the latter part of the nineteenth century, the case law does, intermittently, endorse the proposition that the state must prove sanity and sometimes describes such proof as an element of the state's case.

Nineteenth century Connecticut cases on insanity begin with *State* v. *Johnson,* 40 Conn. 136, 140 (1873), in which the court upheld an instruction that stated, in part, "[i]f upon the whole evidence the jury entertain a reasonable doubt as to the prisoner's sufficient

soundness of mind to be responsible for his acts, it will be their duty to give him the benefit of the doubt, and so render a verdict of acquittal." Only five years later, however, in *State* v. *Hoyt*, 46 Conn. 330, 337 (1878), the court stated that "[t]he law presumes every person of mature years to be of sound mind and competent to commit crime. If the defence be insanity, it is to be proved substantially as an independent fact, and the burden of proof is on the accused. Upon this issue he goes forward and the state rebuts." In dictum, *State* v. *Schweitzer*, 57 Conn. 532, 539–41, 18 A. 787 (1889), followed the rule of *State* v. *Hoyt*, supra, while *State* v. *Lee*, 69 Conn. 186, 199, 37 A. 75 (1897) reverted, sub silentio, to the rule of *State* v. *Johnson*, supra, and described "the fact of the sanity of the accused [as] an element of the crime, a part of the government's case, although it is only impliedly and not in terms alleged . . . ."

In this century, it became the established pattern to place the burden of proof of sanity upon the state, once the defendant had introduced sufficient probative evidence about his mental condition to make his sanity an issue. The nature of the state's obligation was first described as putting upon the state the burden " 'as it [has] in all other particulars' " to satisfy the jury beyond a reasonable doubt about the defendant's sanity and responsibility at the time of his commission of the offense with which he was charged. *State* v. *Joseph*, 96 Conn. 637, 639, 115 A. 85 (1921); see also *State* v. *Kenyon*, 134 Conn. 43, 49, 54 A.2d 585 (1947). More recently, the state's burden was described as including, as an essential element of the crimes charged, "the essential elements of the mental condition requisite to legal responsibility under our governing test." *State* v. *Conte*, 157 Conn. 209, 212, 251 A.2d 81 (1968), cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428 (1969); see also *State* v. *Santangelo*, 205 Conn. 578,

594–95, 534 A.2d 1175 (1987); *State* v. *Davis,* 158 Conn. 341, 355–56, 260 A.2d 587 (1969), vacated on other grounds, 408 U.S. 935, 92 S. Ct. 2856, 33 L. Ed. 2d 750 (1972). The latter decisions, however, ascribe no particular significance to their description of sanity as an "essential element" of the state's case, because in none of these cases was that aspect of the description an issue before the court.

The question before us is what constitutional significance to attach to these various understandings about burdens of proof and elements of a crime. The defendant would have us take the language of the cases, especially references to sanity as an "essential element," as so embedded in our Connecticut jurisprudence that due process requires continued observance of their rulings and precludes the legislature from relieving the state of its burden of proving sanity as an element of its case.

The state urges us, however, to view our cases from a perspective that differentiates between (1) independent facts, as to which the legislature is free to allocate the burden of proof either to the state or to the defendant, and (2) the elements of a crime, as to which due process requires the state to shoulder the burden of proof. The state regards the defense of insanity as relating to an independent fact. Accordingly, the state maintains that the legislature was empowered to shift the burden of proof with regard to that independent fact to the defendant.

We agree with the state that sanity, like the absence of drug dependency; see *State* v. *Hart,* 221 Conn. 595, 608, 605 A.2d 1366 (1992); *State* v. *Januszewski,* 182 Conn. 142, 166, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981); is an independent fact and not an element of any existing criminal offense. As to such an independent fact,

as with regard to other affirmative defenses, the legislature has the constitutional authority to allocate the burden of proof to the defendant rather than to the state. See *State* v. *Hart,* supra, 611; *State* v. *Arroyo,* supra, 430. Other state courts interpreting their state constitutions, many of which are textually and historically similar to ours, have overwhelmingly found no constitutional impediment to such legislation. See, e.g., *State* v. *Bowling,* 151 Ariz. 230, 232, 726 P.2d 1099 (Ct. App. 1986); *People* v. *Hightower,* 172 Ill. App. 3d 678, 692–93, 526 N.E.2d 1129 (1988); *Price* v. *State,* 274 Ind. 479, 483, 412 N.E.2d 783 (1980); *State* v. *James,* 393 N.W.2d 465, 468 (Iowa 1986); *State* v. *Crocker,* 435 A.2d 58, 72 (Me. 1981); *State* v. *Ryan,* 233 Neb. 74, 108–109, 444 N.W.2d 610 (1989), cert. denied, 498 U.S. 881, 111 S. Ct. 216, 112 L. Ed. 2d 176 (1990); *People* v. *Kohl,* 72 N.Y.2d 191, 197–99, 527 N.E.2d 1182, 532 N.Y.S.2d 45 (1988); *Commonwealth* v. *Reilly,* 519 Pa. 550, 566–69, 549 A.2d 503 (1988); *State* v. *Smith,* 512 A.2d 818, 823 (R.I. 1986); *State* v. *Rough Surface,* 440 N.W.2d 746, 758 (S.D. 1989); *State* v. *Messier,* 145 Vt. 622, 626–28, 497 A.2d 740 (1985); contra *People* v. *District Court,* 165 Colo. 253, 266, 439 P.2d 741 (1968). We conclude, therefore, that § 53a-13 (a), as amended, does not violate the due process prohibition against relieving the state of its burden of proving every element of a crime beyond a reasonable doubt.

## C

The defendant's alternate contention is that, regardless of whether sanity is an element of the state's case, our state due process provisions incorporate principles of fairness, justice and morality that require the state to bear the ultimate burden of proof with respect to sanity. Relying particularly on article first, § 9, the defendant argues that historical principles, including natural law as a source of common law and constitutional principles, embody ethical strictures against

criminal responsibility when there is a reasonable doubt about the defendant's mental status. The defendant also argues that contemporary understandings about the nature of guilt in criminal cases require an allocation of the burden of proof on insanity to the state. We are unpersuaded.

Article first, § 9, provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." We have held that the meaning to be attributed to the phrase "except in cases clearly warranted by law" will depend on the particular liberty interest that is at stake. *State* v. *Lamme,* supra, 178. "Such a construction is, of course, entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." Id.

The history of article first, § 9, suggests that it incorporates no single constitutional standard for due process. Its antecedents may be found in a number of quasi-constitutional and statutory enactments dating back to the seventeenth century. See *State* v. *Lamme,* supra, 178–79, and references therein cited; see also B. Chapin, Criminal Justice in Colonial America, 1606–1660 (1983). The earliest reported judicial discussion of the predecessor of article first, § 9, referred to its provisions without distinguishing between statutory and constitutional constraints on governmental intrusions on personal liberty. *Jackson* v. *Bulloch,* 12 Conn. 38, 43 (1837). Regarding the defendant's claimed liberty interest, therefore, these precedents provide no support for his blanket assertion that article first, § 9, is historically rooted in constitutional guarantees protecting against defective statutory law. On the contrary, while some personal rights had their origins in the common law and in pre-1818 declarations of rights, others were created by statute. See C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefini-

tion," 15 Conn. L. Rev. 87, 94 (1982). Nothing in the early declarations of rights specifically addresses the issue of insanity.

In addition to rights enumerated in the state constitution and statutes, late eighteenth century commentators referred also to natural rights as a source of the common law. See, e.g., 1 Root (Conn.), Introduction p. iv. The defendant contends that these common law principles preclude the punishment of a person whose sanity is in doubt.

We agree with the defendant that our common law tradition provides considerable support for the proposition that insanity is a defense to criminal conduct, so that the state could not entirely eradicate such a defense from the penal code. See, e.g., 2 Z. Swift, Digest of the Laws of Connecticut (Dutton Ed. 1871) p. 384. As we have noted on other occasions, our common law history is an important source of enlightenment about the meaning to be ascribed to open-ended constitutional provisions guaranteeing due process. See, e.g., *State* v. *Stoddard,* 206 Conn. 157, 164–66, 537 A.2d 446 (1988); see also E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Alb. L. Rev. 259, 261 (1989).

We do not agree, however, that these common law antecedents limit the power of the legislature to allocate the burden of proof with respect to insanity. Specifically, although the commentators emphasize the impropriety of punishment for a person who lacks the mental capacity and understanding that the criminal law has always required, they do not address the manner in which such lack of capacity is to be shown. More generally, the commentary does not speak to the relative primacy of inconsistent statutory and common law rules.[6]

---

[6] 2 W. Blackstone, Commentaries on the Laws of England (Carey Ed. 1916), Book 4, p. 2175, is not helpful to the defendant on the issue of legis-

Contrary to our federal constitutional heritage, our constitutional tradition in Connecticut has not historically drawn hard lines of separation between constitutional, statutory and common law precepts. See E. Peters, "State Supreme Courts in our Evolving Federal System," 17 Intergovernmental Perspective 21 (1991). For example, Root's introduction broadly describes "The Origin Of Government And Laws In Connecticut" as follows: "Our ancestors therefore as a free, sovereign, and independent people, very early established a constitution of government by their own authority; which was adapted to their situation and circumstances; and enacted laws for the due and regular administration of justice; for the propagation of knowledge and virtue; for the preservation of the public peace, and for the security and defense of the state against their savage enemies. . . . Their common law was derived from the law of nature and of revelation; those rules and maxims of immutable truth and justice, which arise from the eternal fitness of things, which need only to be understood, to be submitted to; as they are themselves the highest authority; together with certain customs and usages, which had been universally assented to and adopted in practice, as reasonable and beneficial." 1 Root (Conn.), supra. Root's description does not elevate common law rules over those enacted by the legislature and does not automatically embed common law rules in the constitution to the exclusion of statutory intervention.

To the extent that common law rules are "derived from the law of nature," it is likely that our ancestors envisaged the possibility that natural law principles could find expression, not only through constitutional rights, but by the actions of a duly constituted and representative legislature. According to Professor Philip

lative authority to modify the common law because Blackstone does not challenge the principle of parliamentary supremacy.

A. Hamburger, eighteenth century Americans understood natural liberty to be the freedom of individuals in the state of nature, while they recognized certain other rights, such as habeas corpus and jury rights, as existing only under the laws of civil government. P. Hamburger, "Natural Rights, Natural Law, and American Constitutions," 102 Yale L.J. 907, 918-22 (1993). "In accordance with their understanding of natural law, Americans assumed that, under civil government, individuals retained only a portion of their natural liberty. They assumed that individuals retained only such natural rights as were reserved by a constitution or, much less securely, were left unimpeded by their other civil laws." Id., 930.

Colonial Americans understood that natural law permitted variations in civil laws "to accommodate the different circumstances in which such laws would operate. Consequently, constitutions and other civil laws could restrain natural liberty in varying degrees and ways and, nonetheless, could still be said to comport with natural law." Id., 937. "When saying that constitutions and other civil laws should be formulated to reflect natural law, Americans typically were not suggesting that natural law was a kind of constitutional law or a source for constitutional rights not protected by a written constitution. On the contrary, under modern natural rights analysis, constitutional law and natural law were quite distinct from one another and played very different roles." Id., 938. "Far from being a form of constitutional law, natural law typically was assumed to be the reasoning on the basis of which individuals adopted constitutions and a means by which the people could measure the adequacy of their constitutions." Id., 940. "Although Americans often discussed constitutional guarantees of natural rights in terms of natural law, they did not broadly incorporate natural

law into their constitutions and usually did not question the positive character of these documents." Id., 954.

Professor Hamburger's analysis suggests that our forebears did not understand natural law to be a source of expansive, unlimited rights that the civil law was prohibited from subjecting to substantial statutory restrictions. We are unprepared, as a constitutional matter, to translate a general concern about the injustice of imposing criminal punishment on the insane into a binding stricture on statutory reallocation of the burden of proof on insanity.

We are equally unpersuaded that modern views about morality in the criminal law make it unconstitutional to require a defendant to prove his insanity in accordance with the terms of § 53a-13 (a), as amended. Although there continues to be considerable disagreement about the appropriate public policy response to mental illness; see, e.g., A. Goldstein, The Insanity Defense (1967) pp. 15–20; G. Christie & A. Pye, "Presumptions and Assumptions in the Criminal Law: Another View," 1970 Duke L.J. 919, 937–38; we are not prepared to hold that the defense of insanity is so central to the issue of criminal culpability that allocating the burden of proof to the defendant, by a preponderance of the evidence, is constitutionally impermissible.[7]

Our analysis of the constitutional requirements of due process in this regard is informed by the understanding that, under the state constitution, as under the federal constitution, "due process is flexible and calls for such procedural protections as the particular situation

---

[7] At least some of the commentary critical of assigning the burden of proof on insanity to the defendant does not take into account the conclusion reached by the United States Supreme Court in *Patterson* v. *New York,* 432 U.S. 197, 205–207, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), that sanity is not an element of the crime in a criminal prosecution. See, e.g., G. Fletcher, Rethinking Criminal Law (1978), § 7.3, pp. 537–38.

demands." *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972); see *State* v. *Lamme,* supra, 178; see also *Tedesco* v. *Stamford,* 222 Conn. 233, 242, 610 A.2d 574 (1992); *Asherman* v. *Meachum,* 213 Conn. 38, 46, 49–53, 566 A.2d 663 (1989). Borrowing the methodology of *Mathews* v. *Eldridge,* 424 U.S. 319, 334–35, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), we must consider three distinct factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [state's] interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."[8]

Applying these factors to the present case, we conclude that imposing on the defendant the burden of proving his insanity by a preponderance of the evidence does not violate due process. The defendant's private interest is that his insanity defense be properly adjudicated. The risk of an erroneous deprivation of that interest is that allocating the burden of proof of insanity to him, by a preponderance of the evidence, rather than to the state, by proof beyond a reasonable doubt, increases the possibility that the defense may fail in circumstances where it should be accepted. Both of these factors argue in favor of the defendant's contention that § 53a-13 (a), as amended, is constitutionally questionable. The third factor, however, cuts the other way. The defendant is much more likely than the state to be able to produce reliable evidence of his own mental

---

[8] The United States Supreme Court has recognized the significance of the inquiry in *Mathews* v. *Eldridge,* 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), in the context of criminal prosecutions. See, e.g., *Herrara* v. *Collins,* 506 U.S. , 113 S. Ct. 853, 864 n.6, 122 L. Ed. 2d 203 (1993); *United States* v. *Salerno,* 481 U.S. 739, 746, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

status. Although the state may have the defendant examined pursuant to Practice Book § 760,[9] such an examination may not level the evidentiary playing field in any particular case, because the defendant controls the contents of his disclosures to the state's psychiatrist. Furthermore, the state's psychiatrist, as a practical matter, may have more limited access than the defendant's psychiatrist to information that the defendant's family and friends may be able to provide regarding the defendant's life history. The *Mathews* analysis reveals, therefore, that § 53a-13 (a) is "entirely consonant with the general contours of a constitutional safeguard rooted in flexible principles of due process." *State* v. *Lamme*, supra.

We conclude, accordingly, that the trial court correctly instructed the jury in accordance with the provisions of § 53a-13 (a), as amended. Our state constitution permits the legislature to determine that the defendant, rather than the state, shoulder the burden of proof on sanity when sanity is not an element in the charge against the defendant.

### III

The defendant's third claim is that he is entitled to a new trial because the trial court failed to protect his rights when the state's attorney argued, in rebuttal, that the jury could consider the defendant's demeanor in the courtroom in evaluating his insanity defense.

---

[9] "[Practice Book] Sec. 760. PSYCHIATRIC EXAMINATION.

"In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination . . . whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

Although the defendant concededly did not object to this rebuttal argument at trial, he maintains that the state's attorney's statement was so prejudicial that the trial court was required, sua sponte, to give the jury a curative instruction. We disagree.

We need not decide, in this appeal, whether the comments of which the defendant now complains would have required a judicial response had there been a timely objection at trial.[10] We adhere to our oft-repeated rule that, unless the remarks of the state's attorney implicate fundamental constitutional rights; see *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973); we will refuse to review unpreserved allegations of prosecutorial misconduct. See, e.g., *State* v. *Hammond,* 221 Conn. 264, 289–90, 604 A.2d 793 (1992); *State* v. *Tweedy,* 219 Conn. 489, 509–510, 594 A.2d 906 (1991); *State* v. *Somerville,* 214 Conn. 378, 393, 572 A.2d 944 (1990). The defendant does not argue that the prosecutor's remarks violated a fundamental constitutional right, but only that the remarks were highly prejudicial.

Furthermore, a single questionable statement by the state's attorney does not merit plain error review under Practice Book § 4185. The injustice, if any, such a statement may manifest would not, in all probability, impair the effectiveness or integrity of the defendant's trial. *State* v. *Person,* 215 Conn. 653, 666, 577 A.2d 1036 (1990), cert. denied, 498 U.S. 1048, 111 S. Ct. 756, 112 L. Ed. 2d 776 (1991); *State* v. *Foreshaw,* 214 Conn. 540, 547, 572 A.2d 1006 (1990); *State* v. *Hinckley,* 198 Conn. 77, 87–88, 502 A.2d 388 (1985).

---

[10] In the absence of a proper objection, courts in other jurisdictions have refused to order a new trial on this ground. See, e.g., *Pope* v. *Wainwright,* 496 So. 2d 798, 802 (Fla. 1986), cert. denied sub nom. *Pope* v. *Dugger,* 480 U.S. 951, 107 S. Ct. 1617, 94 L. Ed. 2d 801 (1987).

## IV

The defendant's fourth claim is that the trial court abused its discretion by permitting the state to introduce evidence of his prior misconduct in its cross-examination of the defendant's psychiatrist. The psychiatrist testified that, in arriving at his diagnosis that the defendant had been psychotic and had suffered from a schizoaffective disorder at the time of the assault, he had relied in part on the defendant's personal history, including two prior assaults in 1983. The state then inquired whether the psychiatrist was aware that these assaults had been so violent as to have caused brain damage to their victims. The psychiatrist acknowledged that he had known only that the defendant had severely beaten others with his fists. The psychiatrist also acknowledged that, although he had known that no insanity plea had been entered with regard to the 1983 assaults, he had not known that the defendant had not been diagnosed as having a mental disease or defect at that time. The trial court immediately instructed the jury that the evidence of the defendant's prior misconduct could be considered only for the limited purpose of assessing the psychiatrist's opinion, and not for a determination of the defendant's guilt or innocence in this case.[11] Although not challenging the wording of the trial court's curative instruc-

---

[11] In its curative instruction, the trial court told the jury:

"Ladies and gentlemen, ordinarily a witness' prior misconduct or criminal record has no bearing whatsoever on any of your responsibilities.

"In other words, you have to decide whether or not the defendant is guilty or not guilty of these particular charges, and it has no bearing whatsoever what he may have done in the past. And that's true in this case as well as to his guilt or his nonguilt.

"However, with respect to the issue of mental disease or defect, for that limited purpose only, the Court allowed the State's Attorney to ask those questions on cross-examination that were just asked about these other alleged incidents, not with respect to the guilt or nonguilt of Mr. Joyner

tion, the defendant had earlier taken a proper exception to this line of questioning, and moved for a mistrial, both at the time of the testimony and the next day, which the trial court denied. We agree with the ruling of the trial court.

The propriety of the state's questioning is governed by *State* v. *Carter,* 198 Conn. 386, 503 A.2d 576 (1986). In that case, we adopted the view of numerous other state courts that a plea of insanity permits an inquiry into the defendant's entire life and thus makes admissible evidence of his prior misconduct to show his mental condition, even though such evidence would ordinarily be excluded. Id., 391–92. "Once the insanity defense is asserted by a defendant the state is entitled to use relevant evidence of prior crimes to rebut it. This rule, of course, is subject to the constraint that the probative value of the evidence must outweigh its prejudicial effect. See *State* v. *Shindell,* 195 Conn. 128, 134, 486 A.2d 637 (1985); *State* v. *Braman,* 191 Conn. 670, 676, 469 A.2d 760 (1983); *State* v. *Holliday,* 159 Conn. 169, 173, 268 A.2d 368 (1970)." *State* v. *Carter,* supra, 393. On appeal, the issue is whether the trial court abused its discretion in concluding that the evidence was admissible. Id., 395.

for the incident offenses, but only with respect to cross-examination concerning the Doctor's opinion that he reached concerning a mental disease or defect.

"And it's very important that you only utilize that testimony, if at all —it's up to you to decide whether to utilize it in any way. If you do utilize it, only with respect to the claim of mental disease or defect. In no way is it to be used against Mr. Joyner that he may have had other prior misconduct, or that he has a criminal record, or that he has convictions. That has no bearing whatsoever on this particular case."

In its final instructions, the trial court reminded the jury that some testimony had been admitted only for the limited purpose of determining the affirmative defense of mental disease or defect. "[Y]ou will recall that I gave you limiting instructions as to how that material was to be utilized, and, obviously, you must follow those instructions and utilize that material only in the way that I instruct you."

The defendant argues that *State* v. *Carter,* supra, did not authorize the state's inquiry in this case because, in *Carter,* the misconduct evidence related to a conviction for murder only four months prior to the incident before the court. According to the defendant, the inquiry in this case concerned events that, having taken place five years earlier, were more remote in time, and, having been graphically described, were more prejudicial.

We conclude that the ruling of the trial court was not an abuse of discretion. It was relevant for the state to ask the psychiatrist how these earlier charges, which had elicited no contemporaneous assertion of mental illness, fit the psychiatrist's diagnosis of the defendant as having suffered from a long-term mental illness. In light of the psychiatrist's acknowledgement that he had been aware of the existence of these charges when he had diagnosed the defendant, it was not impermissibly prejudicial to test the depth of his understanding of what allegedly had transpired. Furthermore, the trial court's immediate sua sponte curative instruction served to minimize the risk of undue prejudice. The defendant cannot prevail on this claim.

V

The defendant's fifth claim is that the trial court improperly denied his request that it undertake an in camera inspection of the mental health records of the victim. The victim acknowledged that she had had several drinks on the occasion of the assaults, and her blood tests, taken immediately after the assaults, indicated a high blood alcohol content. The defendant believed, therefore, that the records might provide information useful to his cross-examination of the witness. The defendant urged the court to inspect such records, because the credibility of the victim was a central issue in this case.

According to the victim's testimony during voir dire before the court and in the absence of the jury, her mental health history included the following. In 1987, depressed about the recent death of her father and the imminent death of her mother, the victim was an inpatient in a New York hospital and received substance abuse counseling at that time. In 1988, after an assault by another man, she went to a shelter for battered women, but received neither professional counseling nor substance abuse treatment at the shelter. She had no further mental health treatment prior to the incident at issue in this case. In February, 1990, eleven months after the alleged assaults, the victim had six weeks of substance abuse treatment as an outpatient.

The trial court ruled that the records of the New York hospitalization were too remote in time to warrant inspection, and that the defendant had failed to make a sufficient preliminary showing of how the victim's mental health or alcohol treatment affected her testimonial capacity so as to warrant inspection of the records of the Connecticut shelter or of the Connecticut outpatient treatment facility. On appeal, the defendant does not challenge the court's finding of temporal remoteness regarding the New York hospitalization. He contends instead that, at least with respect to the victim's outpatient treatment for substance abuse, the court was required to undertake the requested inspection. We agree with the state, however, that the trial court correctly ruled that the defendant had not made the preliminary showing that our decisions have uniformly required to warrant further in camera inspection of mental health records. See *State* v. *Castonguay,* 218 Conn. 486, 590 A.2d 901 (1991); *State* v. *D'Ambrosio,* 212 Conn. 50, 561 A.2d 422 (1989), cert. denied, 493 U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); *State* v. *Pierson,* 201 Conn. 211, 514 A.2d 724 (1986); *State* v. *Bruno,* 197 Conn. 326, 497 A.2d 758 (1985),

cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90 L. Ed. 2d 181 (1986); *State* v. *Esposito,* 192 Conn. 166, 471 A.2d 949 (1984).

The trial court is vested, in the first instance, with the responsibility of resolving the inherent tension between the broad privilege that our state law affords to a witness concerning the confidentiality of his or her psychiatric communications and records, including those pertaining to the diagnosis, prognosis or treatment for alcohol abuse or alcoholism; see General Statutes (Rev. to 1991) §§ 17-155bb (b) (recodified at General Statutes § 17a-630 [c]), 52-146d, 52-146e; and a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. *State* v. *D'Ambrosio,* supra, 55–57; *State* v. *Hufford,* 205 Conn. 386, 401–402, 533 A.2d 866 (1987); *State* v. *Pierson,* supra, 227. The defendant's right of cross-examination does not allow him to discredit and impeach "in whatever way, and to whatever extent, the defense might wish." *Delaware* v. *Fensterer,* 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). Before a defendant may have access to privileged records that "he believes contain information that would allow him to impeach a witness' ability to comprehend, know or correctly relate the truth, [he] must make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness." (Internal quotation marks omitted.) *State* v. *Castonguay,* supra, 505; see also *State* v. *D'Ambrosio,* supra, 58; *State* v. *Pierson,* supra, 225–26; *State* v. *Esposito,* supra, 179–80.

In this case, it was not enough for the defendant to show merely that the victim had consumed alcohol on

the night of the assault and had undergone alcohol treatment thereafter. We have never held that a history of alcohol or drug abuse or treatment automatically makes a witness fair game for disclosure of psychiatric records to a criminal defendant. *State* v. *D'Ambrosio,* supra, 60; *State* v. *Burak,* 201 Conn. 517, 524–25, 518 A.2d 639 (1986); see also *Commonwealth* v. *Caine,* 366 Mass. 366, 369–70, 318 N.E.2d 901 (1974). The trial court granted the defendant complete latitude to question the victim to elicit testimony about how the records he sought might shed light on a relationship between her alleged alcoholism and her capacity to testify truthfully, but he did not do so. He neither subpoenaed the victim's substance abuse counselor, whose identity was known to him, nor did he offer any other medical or other testimony to establish a likely connection between the victim's alleged alcohol abuse and her testimonial reliability. On this record, we conclude that the trial court properly refused to conduct the requested in camera inspection of the victim's records relating to psychiatric and substance abuse treatment.

## VI

The defendant's sixth claim is that the trial court improperly permitted the state's psychiatrist to testify that the defendant had control over his conduct. The basis of this claim is the court's ruling to uphold the state's objection to testimony by the defendant's psychiatrist that the defendant's history of mental disease or defect, schizoaffective disorder, alcoholism and drug abuse "substantially impaired his capacity to conform his conduct to the requirements of the law." The defendant urges us to hold that, despite the absence of an objection at trial to the testimony by the state's psychiatrist, the trial court's inconsistent application of General Statutes § 54-86i[12] deprived the defendant

---

[12] General Statutes § 54-86i provides: "TESTIMONY OF EXPERT WITNESS RE MENTAL STATE OR CONDITION OF DEFENDANT. No expert witness tes-

of a fair trial. This claim is untenable, both procedurally and substantively.

As a procedural matter, the admissibility of expert testimony is a matter of state evidentiary law that, in the absence of timely objection, does not warrant appellate review under *State* v. *Golding,* supra, and *State* v. *Evans,* supra, because it does not, per se, raise a question of constitutional significance. See *State* v. *Forrest,* 216 Conn. 139, 146, 578 A.2d 1066 (1990); see also *State* v. *Raguseo,* 225 Conn. 114, 121, 622 A.2d 519 (1993). Even our ruling in *State* v. *Torres,* 210 Conn. 631, 642–43, 556 A.2d 1013 (1989), which held that a series of inconsistent evidentiary rulings could be so injurious as to impair a defendant's constitutional rights, arose in the context of rulings to which proper exception had been taken.

As a substantive matter, construing § 54-86i narrowly; see *State* v. *Forrest,* supra, 149; the trial court could reasonably have concluded that the testimony of the state's psychiatrist did not violate the statute while the excluded testimony of the defendant's psychiatrist crossed over the line by more closely paralleling the language that the statute forbids.[13] Furthermore, as

tifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto, except that such expert witness may state his diagnosis of the mental state or condition of the defendant. The ultimate issue as to whether the defendant was criminally responsible for the crime charged is a matter for the trier of fact alone."

[13] The state's psychiatrist testified as follows:

"Q. Now, as part of your diagnosis, are you able to say with—well, do you have an opinion as to whether on the night of March 2nd or 3rd Mr. Joyner essentially had control of his own?

"A. Yes, yes, that he did have control of his conduct.

\* \* \*

"Q. Do you have an opinion from your evaluation and all the other information that you gathered as part of this case that he essentially knew what he was doing and knew he shouldn't be doing it?

"A. Well, yeah."

the state points out, the trial court permitted the defendant's psychiatrist to give testimony that, in form, was substantially similar to that given by the state's psychiatrist. The defendant's psychiatrist informed the jury that, in his opinion, the defendant "has a chronic mental illness, [and] that this is an illness that deals with his ability to think, and to make judgments, and to control himself." In addition, he was permitted to tell the jury that, in his view, the defendant's violent behavior on the night of the assaults was the product of his mental illness. Viewed in their totality, the trial court's rulings manifest a consistent approach to the mandate of § 54-86i.

## VII

The defendant's final claim is that the trial court deprived him of his constitutional right to testify at trial by failing to conduct a canvass to determine, on the record, whether the defendant had knowingly and willingly waived his right to take the stand in his own behalf. Defense counsel informed the court, in the defendant's presence, that the defendant had been advised of his rights and that the defendant would not testify.[14] The defendant maintains that, by failing to

[14] The record contains the following colloquy:

"The Court: Mr. Dixon, is it fair to say that your client does not plan to testify?

"Mr. Dixon: Your Honor, my client will definitely not testify.

"The Court: Mr. Joyner, just for the record, do you understand that you have a constitutional right to testify, you also have a right, constitutional right not to testify, and your lawyer has indicated that for reasons that are entirely up to you and your lawyer that you do not wish to testify in this case, is that a fair statement in this case?

"Mr. Dixon: Yes, through me, yes, it is.

"The Court: You won't permit your client to testify?

"Mr. Dixon: He is not going to testify.

"The Court: Mr. Dixon, you won't permit your client to answer to me whether or not he is going to testify to me, yes or no?

"Mr. Dixon: Last I heard I was his legal representative.

"The Court: If that's the way you want it, that's fine. The record can reflect that Mr. Joyner has not spoken, however, his counselor has. As far

insist on a colloquy with the defendant himself, the trial court left the defendant with the impression that it was defense counsel, and not the defendant, who should decide whether the defendant would or would not testify. We disagree.

We decline the defendant's invitation to reconsider our decision in *State* v. *Paradise,* 213 Conn. 388, 404–405, 567 A.2d 1221 (1990), in which we held that a trial judge does not have an affirmative duty to canvass a defendant to ensure that his waiver of his right to testify is knowing, voluntary and intelligent. "We do not believe that federal law contains any such procedural requirement in a case such as this where the defendant has not alleged that he wanted to testify or that he did not know that he could testify. . . . The accused must act affirmatively. While the due process clause of the Fifth Amendment may be understood to grant the accused the right to testify, the 'if' and 'when' of whether the accused will testify is primarily a matter of trial strategy to be decided between the defendant and his attorney." (Citations omitted; internal quotation marks omitted.) Id., 405; accord *United States* v. *Teague,* 953 F.2d 1525, 1532–33 (11th Cir. 1992); *United States* v. *Martinez,* 883 F.2d 750, 757–760 (9th Cir. 1989). As in *Paradise,* the defendant here, even now, does not claim that he wanted to testify or that his lawyer failed to explain the available options to the defendant or ignored his wishes.[15] In these circum-

as the court is concerned, as an officer of the court, I accept Mr. Dixon's representation that his client is not going to testify. And, so far as I'm concerned, the record reflects that he has been adequately, meaning Mr. Joyner, has been adequately—has been adequately—

"Mr. Clark: Advised.

"The Court: That's the word, advised—advised [that] he has the right to testify or not testify."

[15] The state points out that the defendant had, on another occasion, personally expressed to the court his views on his choice of counsel and waiver of conflict. The record demonstrates, therefore, that the defendant was not so inexperienced in court matters that he would have had difficulty in articulating his position if he had been so inclined.

stances, the defendant has failed to demonstrate a violation of his constitutional rights.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and SANTANIELLO, Js., concurred.

BERDON, J., dissenting. I am deeply troubled by the majority's holding that General Statutes §§ 53a-12 and 53a-13,[1] which shoulder the defendant with the burden of proof on the issue of sanity, pass state constitutional muster. I dissent because I believe that §§ 53a-12 and 53a-13, which make mental capacity an affirmative defense that must be proven by the defendant by a preponderance of the evidence, violate the due process clauses contained in the Connecticut constitution, article first, §§ 8 and 9.[2]

I

Like the majority, I begin my analysis by reviewing federal constitutional law in order to put the state constitutional claim in perspective.[3] Certainly, we would hold unconstitutional a statute that required the defendant to prove that he did not intend to commit the crime charged because intent is an element of the crime. *Mullaney* v. *Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975). It is impossible for me to discern any meaningful difference between the intent to commit a criminal act and sanity—both relate to an individual's state of mind. This becomes crystal clear when we examine what must be established in order to succeed under an insanity defense. Under § 53a-13 (a), it is a defense to a prosecution "that the defendant, at

---

[1] See footnote 2 of the majority opinion.

[2] See footnote 5, infra.

[3] I agree with the majority that the defendant has neither adequately raised nor briefed the claim that General Statutes §§ 53a-12 and 53a-13 are unconstitutional as a matter of federal constitutional law.

the time he committed the proscribed act . . . lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." The essence of the defense is that mental disease or defect prevented the defendant from forming the intent necessary to commit the crime, because the defendant was either unable to appreciate the wrongfulness of his or her conduct or unable to control his or her conduct. Individuals who do not have the capacity or ability to understand the nature or effects of their actions cannot possess the mens rea or criminal intent necessary to commit a crime. Even Justice Rehnquist of the United States Supreme Court has conceded that "evidence relevant to insanity as defined by state law may also be relevant to whether the required mens rea was present . . . ." Id., 705–706. The defense negates intent, pure and simple; sanity is therefore an essential element of the crime.

Justice Brennan forcefully argued that sanity is an element of the state's case in his dissent in *Rivera* v. *Delaware,* 429 U.S. 877, 97 S. Ct. 226, 50 L. Ed. 2d 160 (1976). "Like the state rule invalidated in *Mullaney,* which implied malice unless the accused negated it, the plea of insanity, whether or not the State chooses to characterize it as an affirmative defense, relates to the accused's state of mind, an essential element of the crime, and bears upon the appropriate form of punishment. Nor is it sufficient after *Mullaney* to say, as the Court did in *Leland* [v. *Oregon,* 343 U.S. 790, 72 S. Ct. 1002, 96 L. Ed. 1302 (1952)], that a State may characterize the insanity defense as it chooses. We said in *Mullaney* that the requirement of [*In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)] that the State prove all elements of the crime was one of substance, not limited to a State's definition of the elements of the crime . . . ." (Internal quotation marks

omitted.) Id., 880; see also *State* v. *Hart,* 221 Conn. 595, 616–17, 605 A.2d 1366 (1992) (*Berdon, J.,* dissenting). Nevertheless, the majority of the United States Supreme Court implicitly affirmed a decision by the Delaware Supreme Court upholding, on the basis of *Leland* v. *Oregon,* supra, the constitutionality of a statute that placed the burden of proof of insanity on the defendant by a preponderance of the evidence. *Rivera* v. *Delaware,* supra, 878–79.

## II

It is clear that through the lens of our own state constitution, once the issue of the defendant's mental status is raised, due process requires that the state prove beyond a reasonable doubt that the defendant did not lack the capacity to commit the crime. Consequently, I would find that to the extent that §§ 53a-12 and 53a-13 place the burden of proof on the defendant, they violate due process of law under the state constitution. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992).

The majority concedes, as it must, that the due process clauses contained in the Connecticut constitution, article first, §§ 8 and 9, implicitly require the state to prove every element of the crime charged beyond a reasonable doubt. The majority predicates its conclusion that §§ 53a-12 and 53a-13 do not violate this basic tenet of constitutional law on the purported "analytic distinction between mental status as it relates to the insanity defense and mental status as it relates to intent to engage in criminal conduct." Accordingly, it concludes that sanity is not an element of the state's case,

but an independent fact. I cannot accept the majority's conclusion for several reasons. Not only does the insanity defense undermine the intent necessary to commit the crime, but sanity and intent are so inter-related that sanity necessarily becomes an element of the crime. In addition, a reasonable interpretation of our state constitution requires the state to prove the defendant's sanity beyond a reasonable doubt, once the issue has been raised.

In *State* v. *Geisler,* supra, 684–86, we concluded that this court, "[i]n order to construe the contours of our state constitution and reach reasoned and principled results," should employ various approaches for its con-struction.[4] Four approaches—our state common law, state history, sister state precedent, and sociological considerations—are particularly germane in determin-ing whether Connecticut's due process clauses mandate that mental capacity is an element of the crime that the state must prove beyond a reasonable doubt.

In our analysis, we seek to construe article first, §§ 8 and 9, of the Connecticut constitution of 1965, which are derived from article first, §§ 9 and 10, of the Con-necticut constitution of 1818.[5] Given that the debates

---

[4] In *State* v. *Geisler,* 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we noted that the following tools of analysis should be considered in constru-ing the contours of our state constitution: (1) the textual approach; (2) hold-ings and dicta of this court and the Appellate Court; (3) federal precedent; (4) sister state decisions; (5) the historical approach; and (6) economic/socio-logical considerations.

[5] Article first, § 9 of the Connecticut constitution of 1818 provides in rele-vant part: "[The accused] shall not be compelled to give evidence against himself, nor be deprived of life, liberty, or property, but by due course of law. . . ."

Article first, § 8 of the Connecticut constitution of 1965 provides in rele-vant part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law
. . . ."

Both article first, § 10 of the Connecticut constitution of 1818 and arti-cle first, § 9 of the Connecticut constitution of 1965 provide: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

concerning the 1818 state constitution were of great significance when the constitution was amended in 1965, the historical approach to constitutional analysis requires us to ascertain the intent of the framers of the 1818 constitution.[6] Unfortunately, unlike the constitutional convention of 1965, the proceedings of the constitutional convention of 1818 were not recorded. Although we have the benefit of newspaper accounts of the proceedings; W. Horton, "Annotated Debates of the 1818 Constitutional Convention," 65 Conn. B.J. SI-3 (1991); the coverage of the debates was selective and virtually no reported debate exists concerning §§ 8 and 9 (numbered §§ 10 and 11 at the time of the debate). Id., SI-31–32, SI-86. Accordingly, in order to determine the intent of the framers, it is more illuminating to turn to the writings of the two leading scholars who had published legal writings—Chief Justice Zephaniah Swift and Judge Jesse Root.

### III

The defendant claims, and I agree, that in view of our longstanding common law tradition, which predates our state constitution, the issue of sanity is an element of the state's case. As a result, our state constitution requires the state to prove sanity beyond a reasonable doubt. This approach to constitutional interpretation has long been recognized as a means for determining what the framers had in mind. Chief Justice Peters

---

[6] "The 1818 debates are crucial for another reason. Connecticut was one of only two former colonies which did not write a constitution in the late eighteenth century after declaring independence. . . . Connecticut waited until 42 years after the Declaration of Independence and 31 years after the Federal Convention. While we tend to think of both 1818 and 1787 as a long time ago, 1818 was as different from 1787 as today is from 1959. For that reason, what was said to justify language in drafting the U.S. Constitution in 1787 is not a safe guide for construing similar language in 1818." W. Horton, "Annotated Debates of the 1818 Constitutional Convention," 65 Conn. B.J. SI-3 (1991).

recently wrote that "[s]tate courts . . . must be empowered to determine, in light of state interests and *state history,* what meaning to attribute to provisions contained in state constitutions." (Emphasis added.) E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583, 588 (1986). This court held in *State* v. *Stoddard,* 206 Conn. 157, 164–66, 537 A.2d 446 (1988), that we may look to "the historical record and due process tradition" in Connecticut in determining whether article first, § 8 of the Connecticut constitution affords greater rights than its federal counterpart.

The common law provided the foundation for our unwritten constitution prior to 1818. Jesse Root, a judge of the Superior Court, wrote the following in his introduction to the 1789–1793 reports of cases: "Common law is the perfection of reason, arising from the nature of God, of man, and of things, and from their relations, dependencies, and connections: It is universal and extends to all men, and to all combinations of men, in every possible situation; and embraces all cases and questions that can possibly arise; it is in itself perfect, clear and certain; it is immutable, and cannot be changed or altered, without altering the nature and relation of things; it is superior to all other laws and regulations, by it they are corrected and controlled; all positive laws are to be construed by it, and wherein they are opposed to it, they are void." 1 Root (Conn.), Introduction p. ix. Judge Root also noted that the common law "is the Magna Charta of all our natural and religious rights and liberties, and the only solid basis of our civil constitution and privileges—in short, it supports, pervades and enlightens all the ways of man, to the noblest ends by the happiest means, when and wherever its precepts and instructions are observed and followed—the usages and customs of men and the decisions of the courts of justice serve to declare

and illustrate the principles of this law . . . ." Id., pp. x–xi. Indeed, Chief Justice Peters has noted that "[i]n Connecticut constitutional law, it is well established that several rights now denominated as constitutional had well-recognized common law antecedents." E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Alb. L. Rev. 259, 261 (1989). In addition, Chief Justice Peters has recognized that "we should cast a wider net to discover the variety of ways in which substantive rights were protected in state courts in the early years." Id.

The common law antecedents clearly demonstrate that the issue of sanity was an element to be proven by the state. Twenty-two years before the adoption of our first formal constitution in 1818, Justice Zephaniah Swift, a leading Connecticut jurist, noted in his scholarly work on the state common law that "[t]o constitute a crime, it is necessary that there should be a vicious will, and an unlawful act. Where the will is not exercised, there can be no criminality . . . ." 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) pp. 367–68. Five short years after the adoption of the constitution of 1818, Justice Swift wrote: "[I]t is the reason of man that makes him accountable for his actions, and where there is no reason there is no crime . . . ." 2 Z. Swift, Digest of the Laws of Connecticut (1823) p. 361 (Z. Swift, Digest). He further noted that "a court, and jury must exercise a sound discretion in particular cases, *always acquitting where there is a reasonable doubt of capacity* . . . ." (Emphasis added.) Id., p. 362.

Furthermore, it is clear that in the colonial days and into the time of Swift's writings, Connecticut jurists relied upon Blackstone as a source of the common law. Blackstone classified sanity as an essential element of a crime, noting that "an unwarrantable act without a

vicious will is no crime at all." 2 W. Blackstone, Commentaries on the Laws of England (Carey Ed. 1916), Book 4, p. 2175.

Justice Swift's writing on the law of capacity is particularly important. He was instrumental in encouraging the public and the legislature to convene the constitutional convention of 1818. Although he pursued a written constitution in order to achieve separation of powers, his participation as a leader is significant. J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1873) pp. 40–41.[7] Second, since Justice Swift was the chief judge and the state's leading judicial scholar at the time of the convention, his views on the law take on great significance in determining what the framers had in mind when adopting the language of the constitution. See W. Horton, "Connecticut Constitutional History 1776–1988," 64 Conn. B.J. 355, 356–58 (1990).

Connecticut law has consistently provided that an individual could not be subject to punishment without the "mind and capacity, reason and understanding enough to enable him to judge of the nature, character and consequence of the act charged against him, that the act is wrong and criminal, and that the commission of it will justly and properly expose him to penalty." *State* v. *Davis,* 158 Conn. 341, 354, 260 A.2d 587 (1969), vacated on other grounds, 408 U.S. 935, 92 S.

---

[7] " ' 'It is true,' [Justice Swift] observe[d], *'we have no written constitution; our constitution is made up of usages and customs: but it has been* always understood that there were certain fundamental axioms which were to be held sacred and inviolable, and which were the basis on which rested the rights of the people. . . .' " J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1873) p. 41.

Ct. 2856, 33 L. Ed. 2d 750 (1972). Although the state was initially entitled to rely on the presumption that the defendant was sane when the crime was committed, once the defendant introduced substantial evidence tending to prove insanity, "the burden rest[ed] upon the state, *as it [did] in all other essential elements in the case,* to prove beyond a reasonable doubt that the accused was legally sane and responsible at the time the offenses were committed. *State* v. *Conte,* 157 Conn. 209, 212, 251 A.2d 81 (1968), cert. denied, 396 U.S. 964, 90 S. Ct. 439, 24 L. Ed. 2d 428 (1969); *State* v. *Kenyon,* 134 Conn. 43, 49, 54 A.2d 585 (1947); *State* v. *Joseph,* 96 Conn. 637, 639, 115 A. 85 (1921)." Id., 356; see also *State* v. *Evans,* 203 Conn. 212, 237, 523 A.2d 1306 (1987); *State* v. *Lee,* 69 Conn. 186, 199, 37 A. 75 (1897); *State* v. *Johnson,* 40 Conn. 136, 140 (1873). This has always been the law of our state, rooted in constitutional precedent, until 1983 when the legislature designated the insanity defense an "affirmative defense." See Public Acts 1983, No. 83-486, § 1.[8]

The majority circumvents the longstanding history of placing the burden of proof of sanity on the state by noting that there is no temporal case law to indicate that the state bore the burden of proof on this issue prior to 1818.[9] In so stating, the majority ignores firmly stated common law—from Blackstone to Chief Justice

---

[8] Under General Statutes § 53a-12 (b), "[w]hen a defense declared to be an affirmative defense is raised at trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence." It is also important to note that the Commission to Revise the Criminal Statutes stated in its comments that "[t]hose defenses declared 'affirmative defenses' in the Code embrace conduct which *did not heretofore constitute a defense* under Connecticut law." (Emphasis added.) General Statutes Annotated § 53a-12 (b), Commission Comment 1971.

[9] It is interesting to note that the majority of this court did not have any trouble relying on Chief Justice Swift's treatise when they restricted the state constitutional right to bail by engrafting a "good behavior" requirement, contrary to the plain language of the constitution. *State* v. *Ayala,* 222 Conn. 331, 350, 610 A.2d 1162 (1992).

Swift—that defines sanity as an element of the crime.[10] Moreover, the majority ignores the early cases that followed the constitutional convention and can rationally be presumed to have stated the traditional common law. These early cases followed Blackstone and Swift by placing the burden of proof on the issue of sanity on the state. *State* v. *Lee,* supra; *State* v. *Johnson,* supra.[11]

Indeed, approximately half of the jurisdictions require the state to prove the defendant's sanity beyond a reasonable doubt. K. Fritz, "The Proposed Federal Insanity Defense: Should the Quality of Mercy Suffer for the Sake of Safety?" 22 Am. Crim. L. Rev. 49, 54 (1984). "The presumption of sanity is merely the general assumption that, ordinarily, human beings are of sound mind. Sanity and insanity are terms applicable to the mode of operation of the mind as judged by some accepted standard of normality. But as soon as the fact of sanity is put in issue (i.e., where some evidence of mental disorder is introduced), the prevailing rule in most jurisdictions is that sanity, like any other fact, must be proved as part of the prosecution's case beyond a reasonable doubt. Therefore, when all the evidence is in, if there remains a reasonable doubt as to the accused's responsibility, on the ground of insanity and the tests of irresponsibility, there is a reasonable doubt upon the whole issue of his guilt, and he should accordingly be acquitted." (Internal quotation marks omitted.) S. Glueck, Mental Disorder and the Criminal Law

---

[10] The majority's reliance on the lack of affirmative case law prior to 1818 as support for its contention that the state did not bear the burden of proof on the issue of sanity ignores the historical reality that few cases were reported during that time period. As a result, judges relied most heavily on Blackstone and Swift. See W. Horton, "Connecticut Constitutional History 1776-1988," 64 Conn. B.J. 355, 358 (1990).

[11] Aside from *State* v. *Hoyt,* 46 Conn. 330, 337 (1878), and *State* v. *Schweitzer,* 57 Conn. 532, 539–41, 18 A. 787 (1889), both aberrations from the established line of cases, the majority cannot point to any case indicating that sanity was not an element of the crime charged, either before or after the adoption of the constitution of 1818.

(1925) pp. 41–42; see also W. Richardson, The Law of Evidence (3d Ed. 1928) pp. 48–50; 9 J. Wigmore, Evidence (4th Ed. 1981) § 2501, p. 464.

The Colorado Supreme Court, presented with the sanity issue, held that a statute that imposed upon the defendant the burden of proving insanity by a preponderance of the evidence violated the due process provision of its state constitution. "All Colorado decisions from the beginning of territorial days to the present require application of the rule that total guilt must be established beyond a reasonable doubt. Mental capacity to commit a crime is a material part of total guilt for there can be no crime without the mens rea." *People v. District Court for County of Jefferson,* 165 Colo. 253, 265, 439 P.2d 741 (1968). The Arizona court similarly held that a statute that provided for two trials—the first to determine the issue of guilt or innocence and the second to consider the insanity defense—violated the due process provision of the state constitution. "The bifurcated trial would require the jury to find the intent or the intention solely from the circumstances connected with the offense . . . and the question of sound mind would have to be presented at the second trial which gives rise to the question of whether this is due process of law . . . . If an individual is insane he would not be able to intend an act, nor would he be able to premeditate or have malice aforethought." *State v. Shaw,* 106 Ariz. 103, 109, 471 P.2d 715 (1970), cert. denied, 400 U.S. 1009, 91 S. Ct. 569, 27 L. Ed. 2d 622 (1971).

By labeling mental disease or defect an affirmative defense that the defendant must prove by a preponderance of the evidence, the legislature and the majority of this court condone a constitutionally impermissible shift of the state's burden to prove every element of its case. This shift violates our notions of fundamental fairness by violating the time honored rule

that "[i]t is the duty of the Government to establish [a defendant's] guilt beyond a reasonable doubt. This notion—basic in our law and rightly one of the boasts of a free society—is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.' " *Leland* v. *Oregon,* supra, 802–803 (Frankfurter, J., dissenting).

## IV

The defendant also claims that §§ 53a-12 and 53a-13 violate principles of fairness, justice and morality that are deeply embedded in natural law and in the due process provisions of our state constitution, particularly the protections of article first, § 9, which provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." Although the majority acknowledges that natural law principles were widely discussed in colonial America, it concludes that "we are not prepared to hold that the defense of insanity is so central to the issue of criminal culpability that allocating the burden of proof to the defendant, by the preponderance of the evidence, is constitutionally impermissible."

Natural law, which pervaded eighteenth century legal thought throughout America, including Connecticut, is but one of many factors that must be considered in interpreting our state constitution.[12] Natural law theories played a role in shaping the intent of the delegates and the citizens who enacted Connecticut's charter of

---

[12] Although natural law is one of many useful sources in attempting to discern the intent of the framers of our state constitution, it should not be adhered to so as to preclude current economic and sociological considerations. "Constitutional provisions must be interpreted within the context of the times. . . . We must *interpret* the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning." (Citations omitted; internal quotation marks omitted.) *State* v. *Dukes,* 209 Conn. 98, 114–15, 547 A.2d 10 (1988).

liberty; accordingly, it is a necessary part of our analysis. "The framers of our state constitution, like those of the federal constitution, when drafting these clauses had in mind those fundamental [individual] rights, sometimes referred to as 'natural rights,' which the people took for granted as being deeply rooted in the core of liberty. Justice Zephaniah Swift . . . recognized and defended natural rights as follows: 'Natural rights consist in the enjoyment and exercise of a power to do as we think proper, without any other restraint than what results from the law of nature, or what may be denominated the moral law. . . .' " (Citations omitted.) *Doe* v. *Maher,* 40 Conn. Sup. 394, 422–23, 515 A.2d 134 (1986), appeal after remand sub nom. *Doe* v. *State,* 216 Conn. 85, 579 A.2d 37 (1990). Christopher Collier, a professor and historian for the state of Connecticut, has noted that "to Connecticut jurists, common law meant more than judicial precedent and case law; it included the natural law as well." C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94 (1982). The Fundamental Orders (1638–1639), arguably Connecticut's first written constitution, were based upon the natural law premise that " 'where a people are gathered together the word of God requires that to maintain the peace and union of such a people there should be an orderly and decent Government established according to God, to order and dispose of the affairs of the people at all seasons as occasion shall require.' " W. Aspell, "Natural Law in the Connecticut Tradition," 31 Conn. B.J. 105, 105–106 (1957). Professor Tribe, a nationally recognized constitutional scholar, points out that some authorities have "insisted that an intense and widely shared adherence to natural rights ideas by the Constitution's framers led them to neglect more specific mention of rights deemed too obvious to require elabo-

ration." L. Tribe, American Constitutional Law (2d Ed. 1988) § 15-3, p. 1310; see also 2 C. Antieau, Modern Constitutional Law (1969) § 15:44. "The notion that governmental authority has implied limits which preserve private autonomy predates the establishment of the American republic. During the 17th and 18th centuries, there evolved an American tradition of 'natural law,' postulating that 'certain principles of right and justice . . . are entitled to prevail of their own intrinsic excellence.' " L. Tribe, supra, § 8-1, p. 560; D. Farber & S. Sherry, A History of the American Constitution (1990) p. 4.

One of the implicit principles of right and justice is the idea that moral culpability is essential to guilt. To punish for their acts those who cannot be held morally accountable would be cruel and unacceptable. 2 Z. Swift, Digest, supra, p. 362. "The formulations [of the insanity defense] come to us as part of a tradition which makes the notion of 'desert' or 'blame' central to criminal responsibility and which tries to define a class of persons who fall outside the boundaries of blame." A. Goldstein, The Insanity Defense (1967) pp. 9–10. In Connecticut, it is clear that punishment was imposed only on those individuals who freely "choose and practice evil, and . . . refuse and counteract that which is just, right and good . . . for on freedom of choosing, depends the merit or demerit of every action." 1 Root (Conn.), supra, p. xxx. The notion of blame is deeply embedded in Connecticut tradition and is implicit in our concept of liberty and fundamental fairness. To require that the defendant assume the burden of proving insanity or lack of culpability by a preponderance of the evidence violates this essential principle of due process. The defendant is forced to assume the risk on an issue that bears directly on his culpability and places him in the position of being punished when not "clearly warranted by law."

Furthermore, it is reasonable to assume that the framers of the 1818 constitution intended to incorporate within the constitution and its due process protections fundamental principles founded on the history of legal and moral thought. It is also significant, in assessing the framers' intent, that the inhabitants of this state were deeply religious, and that their religious convictions played an important role in shaping Connecticut law. Id., pp. xxi–xxiii. "The requirement of moral culpability for criminal condemnation reaches back to the origins of Western ethical and legal thought. . . . Hebrew law distinguished between the harmful act that was traceable to fault and that which occurred without fault. . . . The Greek moral philosophers, at least as far back as the fifth century B. C., considered the distinction between a culpable and non-culpable act to be among the 'unwritten laws of nature and supported by the universal moral sense of mankind' . . . . The same view pervaded Roman law and appears in the moral teaching of the early Christian Church Fathers. It emerges in Anglo-Saxon law no later than the twelfth century. . . ." (Citations omitted.) American Bar Association, First Tentative Draft, Criminal Justice Mental Health Standards (1983), § 7–6.1, p. 7-271 n.3. This fundamental premise has endured and is embedded in the common law of this state.

## V

In addition to the history and tradition leading up to our state constitution, practical and sociological concerns also compel the conclusion that §§ 53a-12 and 53a-13 violate article first, §§ 8 and 9 of the Connecticut constitution. As the majority acknowledges in footnote 5 of its opinion, "a jury may have difficulty in understanding the distinction between mental status as it relates to the defense of insanity and mental status as it relates to intent." The majority concludes,

nevertheless, that any confusion may be addressed by an appropriate jury instruction. I am not persuaded.

Sanity is an elusive issue that has been the source of disagreement and uncertainty among legal minds and is certain to baffle jurors. To say that the jury is capable of sorting out issues of intent and culpability, especially in the emotionally charged atmosphere associated with a trial in which the defendant's sanity is at issue, is to ignore the reality of our jury system. These issues are complex not only for jurors, but for lawyers and psychiatrists as well. We should not divorce ourselves from the realities of the courtroom by underestimating the difficulty that the sanity issue presents to the average juror.

"Ever since our ancestral common law emerged out of the darkness of its early barbaric days, it has been a postulate of Western civilization that the taking of life by the hand of an insane person is not murder. But the nature and operation of the mind are so elusive to the grasp of the understanding that the basis for formulating standards of criminal responsibility and the means for determining whether those standards are satisfied in a particular case have greatly troubled law and medicine for more than a century." *Smith* v. *Baldi,* 344 U.S. 561, 570, 73 S. Ct. 391, 97 L. Ed. 2d 549 (1952) (Frankfurter, J., dissenting), overruled, *Ake* v. *Oklahoma,* 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985). Chief Justice Swift echoed this sentiment, noting that "[n]o precise rule can be laid down, and a court, and jury must exercise a sound discretion in particular cases, always acquitting where there is a reasonable doubt of capacity: and though a man has some faint glimmerings of reason, yet if he does not comprehend the consequences of what he is doing, cannot distinguish between right, and wrong, and is rather actuated by a blind impulse, he cannot be considered as a moral, and accountable agent." 2 Z. Swift, Digest, supra, p. 362.

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' *In re Winship,* 397 U.S. 358, 370 [90 S. Ct. 1068, 25 L. Ed. 2d 368] (1970) (Harlan, J., concurring). The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Addington* v. *Texas,* 441 U.S. 418, 423, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). For me, proof that a defendant had the mental capacity to form the intent necessary to commit the crime charged is of such importance that the risk of error must fall on the state's shoulders.

Given Connecticut's longstanding tradition of recognizing sanity as an element of the state's case, a tradition so fundamental that it is firmly embedded in our constitutional guarantee of due process, I would hold that §§ 53a-12 and 53a-13, insofar as they place the burden of proof of insanity on the defendant after the issue of sanity has been raised, violate article first, §§ 8 and 9 of the Connecticut constitution.

Accordingly, I dissent.