STATE OF CONNECTICUT *v.* CHRISTOPHER WILLIAMS
(14567)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

---

Argued May 10—decision released August 23, 1994

*Neal Cone,* assistant public defender, for the appellant (defendant).

*James G. Clark,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's

attorney, and *Harry Weller*, assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant, Christopher Williams, was convicted after a jury trial of murder in violation of General Statutes § 53a-54a,[1] attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 and 53a-59 (a) (1),[2] and criminal possession of a pistol in violation of General Statutes (Rev. to 1991) § 53a-217 (a).[3] The trial court sentenced the defendant to a total term of fifty years imprisonment. The defendant appeals from the judgment of conviction to this court pursuant to General Statutes § 51-199 (b) (3).[4] The principal issue

---

[1] General Statutes § 53a-54a provides in relevant part: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-49 provides in relevant part: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-59 provides in relevant part: "ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[3] General Statutes (Rev. to 1991) § 53a-217 provides in relevant part: "CRIMINAL POSSESSION OF A PISTOL, REVOLVER OR ELECTRONIC DEFENSE WEAPON: CLASS D FELONY. (a) A person is guilty of criminal possession of a pistol, revolver or electronic defense weapon when he possesses a pistol, revolver or electronic defense weapon and has been convicted of a capital felony, a class A felony, a class B felony, except a conviction under section 53a-86, 53a-122 or 53a-196a, a class C felony, except a conviction under section 53a-87, 53a-152, 53a-153 or 53a-196b, or a felony under sections 53a-60 to 53a-60c, inclusive, 53a-72a, 53a-72b, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216. For the purposes of this section, 'convicted' means having a judgment of conviction entered by a court of competent jurisdiction."

[4] General Statutes § 51-199 provides in relevant part: "(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any crimi-

raised by the defendant is whether, after the jury had begun to deliberate, the trial court improperly permitted an alternate juror to replace an excused juror in violation of General Statutes § 54-82h (c).[5] In addition, the defendant claims that: (1) the state's closing argument to the jury was improper; (2) his conviction of criminal possession of a pistol rests upon insufficient evidence; (3) the trial court improperly admitted a prior inconsistent statement for substantive purposes in violation of *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); (4) the trial court improperly refused to recall a rebuttal witness of the state so that she could be questioned for bias; and (5) the trial court improperly instructed the jury on reasonable doubt. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The defendant shot Howard White four times, at close range, on the steps of an apartment building in New Haven, at approximately 12:30 a.m. on September 22, 1990.[6] White died as a result of those

nal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[5] General Statutes § 54-82h (c) provides: "Alternate jurors shall attend at all times upon trial of the cause. They shall be seated when the case is on trial with or near the jurors constituting the regular panel, with equal opportunity to see and hear all matters adduced in the trial of the case. If, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him and, if any juror is so excused or dies, the court may order that an alternate juror who is designated by lot to be drawn by the clerk shall become a part of the regular panel and the trial shall then proceed as though such juror had been a member of the regular panel from the time when it was begun. *A juror who has been selected to serve as an alternate shall not be segregated from the regular panel except when the case is given to the regular panel for deliberation at which time he shall be dismissed from further service on said case."* (Emphasis added.)

[6] Although evidence of the defendant's motive was not introduced at trial, the trial court noted at sentencing that the murder was aptly characterized as an assassination related to a drug dispute.

wounds. The defendant also shot in the back Thaddeus Sanders, who witnessed the murder, while Sanders was fleeing the scene after the shooting. The murder was also witnessed by others who provided statements to the police or testified at trial.

At the end of the evidence and final arguments, the trial court charged the jury, concluding its instructions at approximately 4:15 p.m. on Friday, December 20, 1991. The jury retired to deliberate sometime between 4:15 p.m. and 4:32 p.m. Shortly thereafter, the court dismissed the alternate juror, Richard Marks, with instructions not to discuss the case with anyone.

After Marks had departed, at the defendant's request, the trial court brought the jury back into the courtroom to clarify an instruction. The jury deliberated until 5 p.m., at which time the jurors were excused for the weekend.

That evening at approximately 8:05 p.m., one of the members of the jury, Tyrone Dent, was approached by Anthony Dawson. Dawson told Dent that he was the defendant's cousin, whereupon Dent said: "Well, I'm a juror and I can't talk about the case," and then terminated the discussion. Dent initially believed that Dawson had attempted to bribe him. Dent told certain members of his family of the incident, and one of Dent's siblings reported the incident to the state's attorney. The state subsequently informed the trial court of the incident.

On Monday morning, December 23, 1991, the trial court ordered Dent separated from the remaining jury members. The trial court then instructed the remaining eleven jurors not to deliberate until further notice. After questioning Dent as to his ability to remain fair and impartial, the trial court, with the agreement of the parties, determined that Dent was no longer qualified to act as a juror and excused him.

The defendant did not agree to continued deliberations by a jury of eleven as provided for in Practice Book § 841.[7] After extensive discussion, the trial court heard argument as to whether it could substitute a discharged alternate juror after deliberations had begun. The defendant objected to the substitution of an alternate juror for Dent.

The trial court, however, summoned Marks, the alternate juror who had been dismissed the previous Friday, and interviewed him in an attempt to determine whether he was still qualified to sit as a juror. The trial court questioned Marks at length as to whether he had heard anything about the case over the weekend, and whether he had spoken to anyone about the case. Marks stated that he had not spoken to anyone concerning the case and had not heard anything about the case, except an offhanded comment from a neighbor who had told him that the attorney for the defendant was "one of the best defense attorneys in New Haven." After this questioning, the court sent Marks into the voir dire room and brought the remaining eleven jurors into the courtroom. The court then questioned those jurors as to whether they would be able to begin deliberations anew. Having satisfied itself that the jury would be able to recommence deliberations, the trial court proceeded to provide additional cautionary instructions to the jury.[8]

---

[7] Practice Book § 841 provides: "The parties, after submission of the matter to the jury and prior to the verdict, may, by stipulation in writing and with the approval of the judicial authority, elect to have the verdict rendered by a number of jurors fewer than that prescribed by law. The judicial authority shall not permit such an election or stipulation unless the defendant, after being advised by the judicial authority of his right to a trial by a full jury, personally waives such right either in writing or in open court on the record."

[8] Specifically, the trial court instructed the jury as follows: "Ladies and gentlemen of the jury, as I've told you earlier, we have lost one of the jurors, Mr. Dent. We have contacted the alternate juror, Mr. Marks, and he is here and he's available to sit on this case.

"In order to proceed further with deliberations with Mr. Marks, in other words, a jury of twelve, *it would be necessary that the jury, you eleven peo-*

The trial court then questioned the jurors as to whether they could comply with its instructions. Specifically, the court asked "if there is anyone on the jury who feels that they could not erase, so to speak, from your minds whatever was said during the course of the deliberations and start anew with your deliberations, if there's anyone who feels they could not do that, would you please raise your right hand." The jurors indicated that they could and would comply with the trial court's additional instructions.

In light of these inquiries, the trial court concluded that a mistrial was not required because a reconstituted jury with the addition of the alternate juror could fairly adjudicate this case. The trial court noted for the record that the jury had, at that point, deliberated for less than one-half hour. It further noted that all members of the jury had indicated they could recommence deliberations from the beginning and disregard what had taken place during their deliberations the previous Friday.

The court then had Marks sworn as a member of the jury. The trial court then repeated the brief reinstruction that had been given to the jury after Marks had been excused. It also instructed the jury for a third time

---

*ple, start your deliberations anew, start right from the beginning where you started Friday afternoon, late in the afternoon when the case was given to you for deliberation, when the exhibits were delivered in there.*

"And it would be necessary for all of you individually to disregard anything that was said during the course of the discussions you had. And I don't want to get into what they were, but it's obvious, to some extent, they at least involved the selection of a foreman and a determination as to what parts of the transcript you wanted read back and maybe some other things were said, that you'd be required to erase that from your minds and start anew and disregard anything that anybody may have said or any ideas or opinions or thoughts any of you may have had based on the discussions.

"In other words, *start fresh from the first moment you walked into the jury room. And only if all eleven of you can do that can twelve of you continue to deliberate because Mr. Marks was not present during those first deliberations.*" (Emphasis added.)

that they must begin deliberations anew, including choosing a foreperson, and also told the jurors that their prior request to hear testimony that had been made before Marks had joined the panel would be ignored.

The reconstituted jury then retired to deliberate. Approximately one hour and fifteen minutes later, the jury returned a verdict of guilty on all three counts.

Additional facts will be discussed as they pertain to other issues raised by the defendant.

I

The defendant first claims that the trial court improperly permitted substitution of a discharged alternate juror after deliberations had begun in violation of § 54-82h (c). See footnote 5. He argues that § 54-82h (c) implements the Connecticut constitution's guarantee that "[t]he right of trial by jury shall remain inviolate"; Conn. Const., art. I, § 19; and that its violation constitutes per se reversible error.[9] The state concedes that the trial court did not comply with § 54-82h (c).[10] The state argues, however, that the noncompliance was harmless. We agree with the state.

"Where the claimed error is one of constitutional magnitude . . . the state must prove that the error is harmless beyond a reasonable doubt." *State* v. *Sauris*, 227 Conn. 389, 413, 631 A.2d 238 (1993). If the claimed impropriety is not constitutional in nature, however, the

___

[9] The defendant also claims that substitution of an alternate juror for an excused juror after deliberations have begun violates the federal constitution's guarantee that the essential features of the jury trial be preserved. This claim merits little attention. The defendant cites no persuasive authority for this proposition, and there is controlling authority to the contrary. See, e.g., *Williams* v. *Florida*, 399 U.S. 78, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970); *United States* v. *Hillard*, 701 F.2d 1052 (2d Cir.), cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1318 (1983). We therefore reject his claim.

[10] In light of the state's concession, we assume, but do not decide, under the circumstances of this case, that the substitution of an alternate juror after jury deliberations had begun violated General Statutes § 54-82h (c).

defendant bears the burden of proving the harmfulness of the error before a new trial will be granted. Id. The threshold question, therefore, is whether the court's departure from the literal language of § 54-82h (c) violates the defendant's constitutional rights.[11] The defendant argues that § 54-82h (c) implements the Connecticut constitution's guarantee that "[t]he right of trial by jury shall remain inviolate." Conn. Const., art. I, § 19. When charged with a serious crime, a criminal defendant has a constitutional right to a jury trial. Conn. Const., art. I, § 8.

The defendant relies on various authorities predating 1972, which outline the common law right to a jury trial. This reliance is misplaced, however, because an amendment to the Connecticut constitution in 1972, placed the number of jurors in the hands of the legislature. Specifically, amendment four to the state constitution provides in relevant part: "Section 19 of article first of the constitution is amended to read as follows: The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, *to be established by law;* but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. . . ." (Emphasis added.) Conn. Const., amend. IV. The language "to be established by law," that was added to the state constitution in 1972, placed the authority to determine the number of jurors

---

[11] The defendant argues that harmless error analysis is inapplicable because General Statutes § 54-82h (c) implements the state constitution. In support of this claim, the defendant relies on *State* v. *Sinclair,* 197 Conn. 574, 585, 500 A.2d 539 (1985) (harmless error may be inconsistent with statute's unconditional language). We disagree.

It is well settled that, ordinarily, even if a claim of constitutional error is presented, harmless error analysis is applicable. "An erroneous instruction, even of constitutional dimension, is harmless if, viewed in the context of the charge as a whole, there is no possibility that the jury was misled." (Internal quotation marks omitted.) *State* v. *Yurch,* 229 Conn. 516, 522, 641 A.2d 1387 (1994). Thus, even if a violation of § 54-82h (c) implicated the Connecticut or United States constitution, the defendant's requested rule of per se reversal for violation of this statute is without merit.

in the hands of the legislature. In an analogous context, we have held that the numerical composition of a noncapital jury is governed by statute, not by the United States or Connecticut constitution. Since the decision in *Williams* v. *Florida,* 399 U.S. 78, 100, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970), "a jury of twelve is no longer considered a constitutional right, and, as a matter of law, it is not deemed to offer any advantage to the defendant. Nor can it be any longer considered substantial. Thus the statute [§ 54-82] which diminished the jury's size from twelve to six did not take away a substantial right, but operated only in a limited and unsubstantial manner . . . ." *State* v. *Maresca,* 173 Conn. 450, 453–54, 377 A.2d 1330 (1977). Having determined that the numerical composition of a noncapital jury does not implicate rights under the state constitution, we conclude, similarly, that the mechanisms for providing for and dismissing alternate jurors, and the circumstances under which they may be substituted for regular jurors, do not implicate constitutional rights.

Our conclusion that a violation of § 54-82h (c) does not implicate the defendant's constitutional rights, places the burden of proving the harmfulness of the substitution of the alternate juror on the defendant. *State* v. *Beckenbach,* 198 Conn. 43, 49, 501 A.2d 752 (1985); *State* v. *Truppi,* 182 Conn. 449, 465, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981). The defendant has not demonstrated any harm flowing from the substitution of the alternate juror.

The trial court's actions in connection with the substitution of the alternate juror were sufficient to prevent prejudice and to protect the integrity and fairness of the trial. The record indicates that the trial court had questioned Marks at length as to whether he had been compromised or prejudiced in any way as a result

of his dismissal. The trial court had questioned each juror as to whether he or she was willing and able to recommence deliberations, and had instructed the jury three times that it was to begin deliberations anew. The jury had also been told specifically that "it would be necessary for all [of them] to disregard anything that was said during the course of the discussions [they had] had."

The record indicates that an experienced trial court judge had taken painstaking efforts to minimize any potential prejudice to the defendant resulting from the substitution of the alternate juror. It determined that no prejudice had been sustained and that the defendant had received a fair trial. The defendant provides us with no persuasive reason to disturb the trial court's conclusion, and we decline to do so.[12]

## II

The defendant next claims that the state's closing argument violated his due process and equal protection rights under the state and federal constitutions.[13] He argues that the prosecutor engaged in misconduct requiring reversal of the defendant's conviction by making statements in closing argument regarding (1) defense counsel's skill and (2) the importance for female jurors to be tough.[14] We decline to review this claim.

---

[12] The defendant further argues that jury deliberations were not of sufficient length to imply a fresh start. From our review of the record, it is not possible to attribute any special significance to the length of deliberations in this case. There is nothing in the record that indicates that the defendant was in any way prejudiced by the length of the jury deliberations.

[13] The defendant has not provided independent analysis to support his state constitutional claim. We therefore decline to review it. See, e.g., *State v. Joyner*, 225 Conn. 450, 458 n.4, 625 A.2d 791 (1993); *State v. Rosado*, 218 Conn. 239, 251 n.12, 588 A.2d 1066 (1991).

[14] Specifically, with respect to the first part of this claim, the defendant challenges the prosecutor's assertion that defense counsel "has been doing this quite a long time before—" and the prosecutor's comment that "[a]s you can tell, [defense counsel] is very good at her job, you've watched her

Although the defendant objected to these statements, he did not do so with any specificity. He simply stated that the arguments were "absolutely improper." "The purpose of requiring trial counsel to object properly is not merely formal: it serves to alert the trial court to purported error while there is time to correct it without ordering a retrial." *State* v. *Christiano,* 228 Conn. 456, 464, 637 A.2d 382 (1994). By failing to alert the trial court to the rationale for his objection, the defendant failed to preserve his claim.[15] Id.

Because his claim was unpreserved, the defendant seeks to prevail under *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). "We will not afford *Golding* review to claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial." *State* v. *Young,* 29 Conn. App. 754, 766–67, 618 A.2d 65 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993). "[I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Richardson,* 214 Conn. 752, 760, 574 A.2d 182 (1990); *State* v. *Robinson,* 227 Conn. 711, 746, 631 A.2d 288 (1993). "[W]e must review the comments

do it. However, don't let her experience and her skill—[interrupted by objection, and thereafter unfinished]." With respect to the second claim the defendant challenges the prosecutor's assertion that "[t]here's courthouse lore here—and these things grow up in a courthouse—one of them says that women aren't tough enough to convict or they let emotion cloud their judgments and that's what happens on an average jury. Well, none of you believe that and we didn't pick you believing that or there wouldn't be any women on this jury."

[15] See also Practice Book § 4185 which provides in relevant part: "The court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial."

complained of in the context of the entire trial." *State*
v. *Robinson,* supra, 746.

Although we do not review these statements, we
nonetheless deplore gratuitous use of gender stereo-
types as part of any argument. The defendant correctly
points out that this type of comment singles out female
jurors from their counterparts. The prosecutor's state-
ment amounted to a challenge to the women jurors to
convict the defendant or risk condemnation as being
soft or emotional. The state's argument could have sub-
jected the female jurors to pressure from other jurors.
We caution against the use of this type of condescend-
ing argument used by the state.

## III

The defendant next claims that the trial court improp-
erly admitted into evidence at trial the transcript of
Sanders' testimony at the probable cause hearing (hear-
ing). The transcript of Sanders' testimony included a
prior inconsistent statement admitted at the hearing
under *State* v. *Whelan,* supra, 200 Conn. 743. The
defendant claims that the admission of the transcript
at trial improperly infringed his right to confront wit-
nesses under the sixth and fourteenth amendments to
the United States constitution and under the Connect-
icut constitution,[16] and that the admission violated the
rules of evidence. The state claims that the admis-
sion of Sanders' prior inconsistent statement within
his hearing testimony was proper, and that even if
improper, the admission was harmless. We agree with
the defendant that the admission of the *Whelan* testi-
mony was improper, but conclude that its admission
was harmless.

The following facts are relevant to this claim. As
noted previously, Sanders witnessed the murder and

---

[16] The defendant has failed to provide a separate analysis of his claim
under the Connecticut constitution, and we therefore decline to review it.
See footnote 13.

was shot by the defendant as Sanders fled the scene. During the course of the hearing, Sanders gave testimony substantially similar to that which he had previously given to the police, except that he declined to identify the defendant as the person who had committed the crime. At that point, the state offered, for substantive purposes, his prior statement to the police, which included his identification of the defendant as the person who had killed White. This sworn statement was made nine days after the incident, and was factually identical to Sanders' hearing testimony, except for the identification of the defendant.

At trial, after demonstrating that Sanders was not available to testify, the state offered his hearing testimony as evidence. The trial court admitted this evidence over the defendant's objection. The defendant claims, in the alternative, that the admission at trial of a prior inconsistent statement to prove the truth of its assertion, within an otherwise admissible hearsay statement, is impermissible as an evidentiary matter, if the witness does not testify at trial. The defendant also claims that the admission of the hearing testimony violated his right to confrontation under the sixth and fourteenth amendments to the United States constitution. The determination of whether a defendant's claim implicates the right to confrontation under the federal constitution rests on whether it satisfies the two part test established in *Ohio* v. *Roberts,* 448 U.S. 56, 63, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). That test requires (1) demonstration that the witness is unavailable to testify at trial and (2) adequate indicia of reliability of the previous testimony. The trial court found that the state demonstrated that Sanders was unavailable to testify at trial. Additionally, our review of the record indicates that Sanders' testimony at the hearing bears adequate indicia of reliability to warrant submission of the transcript to the jury. Sanders' hearing testimony was given under oath, subject to crim-

inal penalties for perjury. Further, his testimony was given before a judicial tribunal that kept an accurate judicial record of the proceedings. In addition, defense counsel tested Sanders' statements at the hearing in a manner that was the equivalent of significant cross-examination.

Because the state demonstrated that Sanders was not available to testify, and because both the hearing testimony and the prior inconsistent statement independently bear adequate indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior statements, the defendant's right to confrontation was not implicated by the admission of the hearing testimony.

The state argues that the statement is admissible hearsay because each statement was independently admissible. Although double hearsay is admissible if each part is independently admissible, the prior inconsistent statement at issue here was not independently admissible for substantive purposes because the witness did not testify at trial.

In *State* v. *Whelan,* supra, 200 Conn. 753, we adopted a rule "allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, *when the declarant testifies at trial and is subject to cross-examination.*" (Emphasis added.) "[W]hen the declarant is available for cross-examination the jury has the opportunity to observe him as he repudiates or varies his former statement. The cross-examination to which a recanting witness will be subjected is likely to be meaningful because the witness will be forced either to explain the discrepancies between the earlier statements and his present testimony, or to deny that the earlier statement was made at all. . . . The jury can, therefore, determine whether to believe the present testimony, the prior statement, or neither." (Citations omitted; internal quotation marks omitted.) Id., 750.

*Whelan* does not extend to situations in which the declarant of the prior inconsistent statement does not testify at trial. Therefore, under the facts of this case, it was improper to admit the prior inconsistent statement for substantive reasons because the witness did not testify at trial. We agree, however, with the state that this evidentiary error was harmless. If a claim on appeal is nonconstitutional in nature, the burden of establishing that the error was harmful is on the appellant. *State* v. *Beckenbach,* supra, 198 Conn. 57–59; *State* v. *Randolph,* 190 Conn. 576, 588–89, 462 A. 2d 1011 (1983); *State* v. *Truppi,* supra, 182 Conn. 465. Our review of the record indicates that the state produced compelling evidence of the defendant's identity and guilt. At least two other witnesses provided statements connecting the defendant to the crime. The defendant has provided no analysis of his conclusory claim that the admission of the hearing testimony "may well have affected the verdict." Under these circumstances, we conclude that the admission of the hearing testimony was harmless because it is reasonably probable that had the evidentiary ruling been proper, the verdict would not have been different. *State* v. *Cerilli,* 222 Conn. 556, 567, 610 A.2d 1130 (1992).

IV

The defendant next claims that there was insufficient evidence to support a finding that the gun with which he had killed White had a barrel less than twelve inches in length as required by General Statutes (Rev. to 1991) § 53a-217 and General Statutes § 53a-3 (18).[17] We disagree.

The standard governing our review of sufficiency of evidence claims is well established. "We first review

---

[17] See footnote 3 for the relevant text of General Statutes (Rev. to 1991) § 53a-217.

General Statutes § 53a-3 (18) defines a pistol as "any firearm having a barrel less than twelve inches."

the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Joyner*, 225 Conn. 450, 455, 625 A.2d 791 (1993). "[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Francis*, 228 Conn. 118, 127, 635 A.2d 762 (1993).

The defendant relies on *State* v. *Brown*, 173 Conn. 254, 260, 377 A.2d 268 (1977), for the proposition that the failure of the state to introduce direct numerical evidence that the barrel of the gun was less than twelve inches in length renders the evidence insufficient to support a conviction under §§ 53a-217 and 53a-3 (18). In *State* v. *Brown*, supra, 260 and n.5, we determined that testimony that the defendant had pulled a small gun from under his shirt was insufficient to support the jury's finding that the barrel of the gun was less than twelve inches in length. Although the defendant's reading of *Brown* is correct, we now determine that in *Brown* we were incorrect in holding that the evidence produced in that case was insufficient, as a matter of law, for the jury to infer that the length of the barrel of the handgun was less than twelve inches. Accordingly, *State* v. *Brown*, supra, 254, is overruled to the

extent that it requires the state to introduce direct numerical evidence of the length of the barrel of a handgun to support a conviction under §§ 53a-217 and 53a-3 (18).

At trial, the gun that had been used to kill White was not introduced into evidence. The state, however, presented several witnesses who testified that the defendant pulled a "small handgun" out of his "waist length jacket."[18] Further, the jury heard from Tivette Smith and Guy Gilmore, other eyewitnesses to the shooting, who described the article of clothing from which the defendant pulled the gun as a "beige, sweater-like coat" and a "dark sweater."

From this evidence the jury could have reasonably inferred that the handgun that the defendant pulled from the pocket of a small sized outer garment that he wore was less than twelve inches long and that, accordingly, the state had proved this element under §§ 53a-217 and 53a-3 (18) beyond a reasonable doubt. Although it would have been preferable for the state to have asked any of the witnesses to compare the length of the barrel of the handgun to a twelve inch ruler, it is extremely unlikely that anyone would describe as "small" a handgun that had a barrel of one foot or longer.[19] For the above reasons we reject the defendant's claim.

---

[18] In addition to hearing the probable cause testimony of Sanders regarding the "small handgun" that the defendant pulled from his "jacket pocket," the jury heard the statement of David Lisbon, another witness to the shooting, that "[the defendant] *put his hand in his pocket . . . and pulled out the gun* and began to shoot [White]." (Emphasis added.)

[19] Juxtaposed to a common twelve inch ruler, a twelve inch pistol barrel would look like the very distinctive and fabled "Buntline Special" creation of the nineteenth century American story writer Edward Z. C. Judson. Certainly there was nothing in the evidence from which the jury could reasonably have found or inferred that the barrel of the defendant's handgun was of this dimension.

## V

The defendant next claims that the trial court improperly limited his right to confront a witness on surrebuttal in violation of the sixth amendment to the United States constitution, the Connecticut constitution[20] and the rules of evidence. He argues that the trial court's refusal to permit him to recall a witness on surrebuttal improperly limited his right to confrontation. We disagree.

The following facts are relevant to this claim. After the defense rested, the state called several witnesses on rebuttal, including Jamesetta Dukes. Dukes testified that her son, Charles Dukes, a key defense witness, had told her that the defendant's "boys" had offered him $5000 to testify that the defendant did not shoot White.

After the defendant's cross-examination of Jamesetta Dukes, the state rested. Outside the presence of the jury, the defendant requested that he be allowed to recall her as a surrebuttal witness. In support of this request, the defendant made an offer of proof of testimony he expected to elicit from Dukes that would tend to demonstrate her bias in favor of the state.[21]

Initially, we note that there is "no constitutional right to present surrebuttal evidence." *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission,* 220 Conn. 527,

---

[20] The defendant has failed to provide an independent analysis of his state constitutional claim and, therefore, we decline to review it. See footnote 13.

[21] Specifically, the defendant's offer of proof was that "at the time of the shooting [Dukes] was in the process of being evicted for nonpayment of rent. And, in addition, her utilities were so far behind that they were being cut off, but that as soon as her daughter went to give a statement, she miraculously came up with all of the money for her back utilities and her back rent. That's what I want to elicit, Your Honor, as her motive and bias for testifying falsely."

555, 600 A.2d 757 (1991). The presentation of surrebuttal evidence is a matter resting squarely within the discretion of the trial court. *State* v. *Anderson,* 209 Conn. 622, 634, 553 A.2d 589 (1989). The defendant must demonstrate some compelling circumstance and the proffered evidence must be of such importance that its omission puts in doubt the achievement of a just result. *State* v. *McKnight,* 191 Conn. 564, 580, 469 A.2d 397 (1983). In the present case, the defendant has failed to show any compelling circumstance for this surrebuttal evidence. The defendant made no effort to cross-examine Dukes for bias after her rebuttal testimony. There were no compelling circumstances from which the defendant could claim a right to surrebuttal.

We are equally unpersuaded that the defendant had demonstrated that the proffered evidence could have placed the result of the trial in doubt. The defendant's offer of proof failed to claim a connection between any benefit to Dukes and an agent of the state that might suggest bias. The trial court did not abuse its discretion in denying this surrebuttal testimony.[22]

---

[22] The defendant's final claim is that the trial court improperly instructed the jury that a reasonable doubt is a doubt "for which a reasonable man or woman can give a valid reason." He argues that this instruction on reasonable doubt violated his right to due process. Because this claim is unpreserved, he seeks to prevail under *State* v. *Golding,* supra, 213 Conn. 233.

The challenged instruction is identical to the instruction recently approved by this court in *State* v. *Gomez,* 225 Conn. 347, 353, 622 A.2d 1014 (1993), and numerous cases cited therein. In our previous cases, we concluded that this instruction did not decrease the state's burden of proof when viewed in the context of the charge as a whole. Id., 354. In this case, the jury charge, taken as a whole, presents an accurate definition of proof beyond a reasonable doubt.

"Because we find neither a clear violation of a fundamental constitutional right nor a deprivation of a fair trial, the defendant's unpreserved claim does not satisfy the second and third conditions set forth in *State* v. *Golding,* supra [213 Conn. 233]. Therefore, the defendant cannot prevail on this claim." Id.

The judgment is affirmed.

In this opinion PETERS, C. J., and CALLAHAN, J., concurred.

BORDEN, J., concurring. I agree fully with parts I, III, IV and V of the majority opinion. I concur with the result reached by the majority in part II, but not, however, with the majority's analysis.

Part II of the majority opinion deals with the defendant's challenge to certain aspects of the state's final argument. I concur with the majority in rejecting that challenge, but I reach that result by a different route. The defendant's challenge on appeal is in two separate parts. The first part deals with the prosecutor's reference to the skill of the defense attorney. The second part deals with the prosecutor's reference to the "courthouse lore" regarding female jurors.

I disagree with the majority that either of these challenges was not adequately preserved at trial. My reading of the record indicates that the trial court was adequately advised of the essential nature of the objections made by the defendant. Analyzing the two challenges separately, I conclude that (1) there was nothing improper about the prosecutor's reference in his closing argument to the skill of the defense attorney, and (2) the prosecutor's reference to the female jurors was improper but harmless.

Regarding the prosecutor's reference to the skill of the defendant's attorney, the defendant claims that the "obvious import of the prosecutor's comments was that defense counsel had been retained solely to distort the facts and camouflage the truth in an attempt to confuse the jury as to her client's involvement in the homicide." There simply is no basis in this record for such a characterization of the prosecutor's comments.

The defense counsel ended her final argument by urging the jury to acquit the defendant on the basis of a reasonable doubt.[1] The prosecutor then began his rebuttal argument: "Miss Wise has been doing this quite a long time before . . . ." The defense counsel then objected on the ground that "that is absolutely improper." After the prosecutor asked, "I'm not allowed to say that it must be obvious to this jury that Miss Wise is an experienced, skillful lawyer," the defense counsel stated, "No, he is not allowed to say that." After the trial court overruled the objection to the argument, the prosecutor continued: "As you can tell, Miss Wise is very good at her job, you've watched her do it. However, don't let her experience and her skill . . . ." At that point, the defense counsel objected again, and the court again overruled the objection. The prosecutor then continued his argument, the principal thrusts of which were to counter the defense counsel's interpretation of the evidence, to counter other arguments that she had made in an attempt to convince the jury that there was reasonable doubt about the defendant's guilt, and to remind the jury of the strengths of the state's case.[2]

---

[1] The defense counsel had stated: "There's a dead man here, there's a wounded man here, everybody feels terrible about that. It's a tragedy that people feel on the street. It would be more of a tragedy for an innocent man, a man who has not been proven to be guilty beyond a reasonable doubt, to have his life destroyed because of guesses, surmises or what you think might have happened on Orchard Street. If you were sitting where he's sitting, wouldn't you want your jury to be pretty damn sure before you voted to convict someone? Thank you."

[2] After the prosecutor had concluded, the defense counsel elaborated on her objection to the prosecutor's final argument by linking it to the court's proposed charge to the jury that a reasonable doubt is not a doubt that is raised by the ingenuity of counsel and is not warranted by the evidence. She stated: "that may be a fine instruction sometimes, but because of this particular closing, *which is an objectionable and a personal and professional attack on me,* that that kind of instruction is wrong under the facts and circumstances of this case and I object to it." (Emphasis added.)

I think that the emphasized language above was sufficient to make clear to the trial court the serious nature of the defendant's challenge to the state's

This record discloses no basis for the defendant's claim that the prosecutor's argument suggested that defense counsel had been retained solely, or in part, for the purpose of distorting the facts in an attempt to confuse the jury regarding the defendant's involvement in the charged homicide. In fact, the argument of the prosecutor was to the effect that, as the trial court properly noted, a doubt raised by the ingenuity of counsel *and not warranted by the evidence or lack thereof* is not a reasonable doubt. I see nothing wrong, constitutional or otherwise, about such an argument, and regard it as well within the bounds of zealous but proper advocacy.

With respect to the prosecutor's argument regarding female jurors, I also believe that it was adequately preserved.[3] Furthermore, despite the state's claim in its brief that this argument does nothing more than mirror the findings of the Task Force on Gender, Justice and the Courts, I believe that the argument implicitly addresses itself to the female members of the jury, and I do not think that it is proper for any advocate, state or defense, to address particular members of the jury. Furthermore, I join in the majority's condemnation of the implicit sexist message of the argument. The impropriety of the argument having been brought

argument. Claiming that the prosecutor has made a personal and professional attack on the defense counsel in closing argument is, in my view, sufficient to preserve an appellate challenge to the propriety of the argument, even though the challenge did not specifically mention its legal basis. Moreover, even if this record falls short of complete and adequate preservation of the claim, I would review the claim because it raises an issue that probably occurs with some frequency in final arguments.

[3] More specifically, the defense counsel stated: "I object to those aspects of the closing which talked about courthouse lore that women on the jury can't convict, which is a test to the women on the jury to show how tough you are, you have to convict. That kind of gender argument is as inappropriate as a racial argument and is wrong and is improper and I ask that a curative instruction be given on that."

to the attention of the trial court, the court improperly declined the defendant's request for a curative instruction.

I am not persuaded, however, that there is anything constitutional about this impropriety. The prosecutor's argument was, rather, much like the instructional error we identified in *State* v. *Walton,* 227 Conn. 32, 64, 630 A.2d 990 (1993). In that case, we characterized as "a nonconstitutional claim in constitutional garb"; id.; instructions that suggested that jurors, as officers of the court, uphold the law of the land " 'by rendering a verdict of guilty if the facts and the law require such a verdict.' " Id., 63. I conclude, further, that the error was harmless, because the defendant has not established that it is more likely than not that the verdict would have been different absent the error.

BERDON, J., dissenting. The defendant's claim concerning the prosecutor's rebuttal argument before the jury deeply concerns me and requires reversal by this court. The majority refuses to consider this claim on the ground that the defendant did not object to the prosecutor's argument at trial "with any specificity." The record makes clear, however, that the defendant raised very specific objections to the prosecutor's improper and prejudicial comments, properly preserving his claim under our law.

There were at least two segments of the prosecutor's rebuttal argument that were improper and prejudicial. First, the prosecutor impugned the professionalism of the defense counsel, implying that she had distorted the facts and camouflaged the truth during her closing argument in an attempt to confuse the jury. The following discussion took place in the jury's presence during the prosecutor's rebuttal argument:

"Mr. Clark [prosecutor]: Miss Wise has been doing this quite a long time before—

"Ms. Wise [defense counsel]: Objection, Your Honor, that is absolutely improper.

"Mr. Clark: I don't think so.

"The Court: Wait a minute. Read back what he said.

"Ms. Wise: Well, Your Honor, I rather it were not read back.

"Mr. Clark: Excuse me.

"The Court: Was it in reference to Miss Wise's experience as a lawyer, is that what it was?

"Mr. Clark: Yes. I'm not allowed to say that it must be obvious to this jury that Miss Wise is an experienced, skillful lawyer?

"Ms. Wise: No, he is not allowed to say that.

"The Court: Miss Wise, the jury will understand that whether lawyers are experienced or not is not evidence tending to prove anything [in] this case, but I think it is a reasonable argument that one can make within a very brief fashion. Go ahead, Mr. Clark.

"Mr. Clark: As you can tell, Miss Wise is very good at her job, you've watched her do it. However, don't let her experience and her skill—

"Ms. Wise: Your Honor, that's what I'm objecting to.

"Mr. Clark: Well, you certainly are.

"Ms. Wise: I object to that argument.

"The Court: Miss Wise, that argument is not improper.

"Ms. Wise: I take exception.

"The Court: All right.

"Mr. Clark: And making sure that there is no continuity to the argument that I'm going to make for you is also part of that technique. So keep that in mind as I get interrupted, which I did not do."

The federal courts have held that it is constitutional error for a prosecutor to attack the integrity of defense counsel in order to impute guilt to a defendant. "[T]he obvious import of the prosecutor's comments was that . . . defense counsel in criminal cases are retained solely to lie and distort the facts and camouflage the truth in an abominable attempt to confuse the jury as to their client's involvement with the alleged crimes." *Bruno* v. *Rushen,* 721 F.2d 1193, 1194 (9th Cir. 1983), cert. denied sub nom. *McCarthy* v. *Bruno,* 469 U.S. 920, 105 S. Ct. 302, 83 L. Ed. 2d 236 (1984). "Even though such prosecutorial expressions of belief are only intended ultimately to impute guilt to the accused, not only are they invalid for that purpose, they also severely damage an accused's opportunity to present his case before the jury. It therefore is an impermissible strike at the very fundamental due process protections that the Fourteenth Amendment has made applicable to ensure an inherent fairness in our adversarial system of criminal justice." Id., 1195; see also *United States* v. *McDonald,* 620 F.2d 559, 564 (5th Cir. 1980).

This prosecutor's rebuttal argument is particularly harmful when viewed in the context of the jury instruction the trial court gave on the "ingenuity of counsel." The trial judge instructed the jury, in part, as follows concerning the state's burden of proof: "A reasonable doubt is not a doubt raised by one who questions just for the sake of raising a doubt. A reasonable doubt is not a surmise or speculation, conjecture or an imaginary doubt. A reasonable doubt is not a captious or a frivolous doubt, *nor is it a doubt which is raised by the ingenuity [of] counsel* or by a juror and which is unwarranted by the evidence, nor is it a doubt prompted by

sympathy for the defendant." (Emphasis added.) This instruction lent credence to the prosecutor's suggestion that defense counsel, through devious means, was attempting to confuse the jury about the guilt of her client.[1]

Defense counsel clearly objected to the prosecutor's comments on her skill, both during the rebuttal argument, as discussed previously, and immediately after it. The objection that followed the prosecutor's rebuttal argument was made with great specificity:

"Ms. Wise: Your Honor, I had some objections to the closing argument. Do you want me to do them now or do you want me to do them after the charge?

"The Court: I suppose you perhaps ought to do it now.

"Ms. Wise: I object, Your Honor, to the repeated attacks, which I consider feminine attacks. Attacks on me because—and I would ask Your Honor in light of those kinds of attacks on a lawyer, which I believe are unethical, to eliminate from the charge that aspect which I believe Your Honor gives on, 'it is not a doubt put in your mind by the ingenuity of counsel,' because, in fact, if a reasonable doubt is put in the mind by the ingenuity of counsel that is perfectly reasonable, that is a reasonable doubt and that is the job of counsel.

"So, I'd object, given the strong attacks on me personally and my way of trying the case, that if Your Honor was going to give that charge, that it be eliminated. I object to that part of the charge anyway.

---

[1] Indeed, when defense counsel attempted to call the court's attention to the improper argument, it played into the hands of the prosecutor. As noted previously, after defense counsel objected to the prosecutor's comments concerning her skills, the prosecutor stated that defense counsel was deliberately interrupting him as part of her "technique" for confusing the issues. Defense counsel understandably abstained from objecting to this statement in the jury's presence, and the trial judge did not caution or rebuff the prosecutor.

"The Court: I'm not making it a part.

"Ms. Wise: But I object—

"The Court: I'm going to give that, but you didn't read the whole sentence, 'and unwarranted by the evidence,' you forgot that part. . . .

"Ms. Wise: I understand that. All I'm saying is because of this particular closing, that may be a fine instruction sometimes, but because of this particular closing, which is an objectionable and a personal and professional attack on me, that that kind of instruction is wrong under the facts and circumstances of this case and I object to it. I'm not saying on some cases it isn't right, in this case it's wrong. I object to the closing and I ask for a curative instruction on that and I ask that that instruction on ingenuity of counsel not be given."

Under our law, a claim that a prosecutor has made prejudicial comments during closing argument is properly preserved as long as the defendant objects to the comments either when they are made or at the close of arguments. Furthermore, a defendant preserves his claim that the comments deprived him of a fair trial if he seeks a curative instruction or mistrial on the basis of the comments. *State* v. *Tyler-Barcomb,* 197 Conn. 666, 673, 500 A.2d 1324 (1985), cert. denied, 475 U.S. 1109, 106 S. Ct. 1518, 89 L. Ed. 2d 916 (1986); see also *State* v. *Castonguay,* 218 Conn. 486, 508, 590 A.2d 901 (1991). Contrary to the majority's conclusion, the defendant's very specific objection and request for a curative instruction following closing arguments preserved all of his rights to review of this claim.

The second argument made by the prosecutor is equally egregious.[2] During his rebuttal, the prosecu-

---

[2] I also find objectionable a third set of comments made by the prosecutor during his rebuttal argument: "There's some worse courthouse lore for this time of year which is called the Christmas verdict. . . . [W]hat that

tor stated that: "There's courthouse lore here—and these things grow up in a courthouse—one of them says that women aren't tough enough to convict or they let emotion cloud their judgments and that's what happens on an average jury. Well, none of you believe that and we didn't pick you believing that or there wouldn't be any women on this jury."

The judiciary of this state has made clear that gender bias has no place in our legal system and will not be tolerated. See Connecticut Judicial Branch, Gender and Justice: Guidelines to Ensure Fairness, A Handbook for the Courts (1991). This handbook states that "[j]udges, attorneys and judicial employees . . . must be aware continuously of the need to speak and act without regard to gender bias." Id., p. 2. More specifically, "[t]he ability of jurors to apply the relevant law in arriving at a verdict is not dependent on their gender." Id., p. 3.

Telling female jurors that they are thought to be weak and emotional, and that they may dispel this notion by voting to convict, is reprehensible conduct that violates the defendant's right to a fair trial. The majority concedes that "[t]he prosecutor's statement amounted to a challenge to the women jurors to convict the defendant or risk condemnation as being soft or emotional" and that such conduct "singles out female jurors from their counterparts" and "could have subjected the female jurors to pressure from other jurors." Four or five of the jurors were women.

---

means is the average juror gets caught up in the pressure of the season coming or the spirit of the season and gives the defendant a little gift, which is his acquittal, or we're going to get caught up in the spirit of the season and we're going to require more than proof beyond a reasonable doubt." Defense counsel objected to this argument as well. We certainly would not condone an argument by defense counsel that the jury should acquit the defendant in keeping with the spirit of the season.

After closing arguments were finished, defense counsel objected to the prosecutor's comments concerning female jurors: "I object to those aspects of the closing which talked about courthouse lore that women on the jury can't convict, which is a test to the women on the jury to show how tough you are, you have to convict. That kind of gender argument is as inappropriate as a racial argument and is wrong and is improper and I ask that a curative instruction be given on that." The trial court refused, however, to give the jury a curative instruction in order to ameliorate the prosecutor's improper argument and assure the female jurors that they should not feel pressured to convict. I believe this prevented the defendant from receiving a fair trial.

Even if the prosecutor's conduct did not rise to the level of a constitutional violation, a reversal of these convictions would be required under our supervisory powers; see *State* v. *Ruiz,* 202 Conn. 316, 330, 521 A.2d 1025 (1987); because the state's case was not overwhelming. The majority states, in connection with the defendant's claim pursuant to *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86 (1986), that "the state produced compelling evidence of the defendant's identity and guilt" because "[a]t least two other witnesses [apart from Thaddeus Sanders] provided statements connecting the defendant to the crime." This significantly overstates the state's case. The state called three other witnesses to the crime at trial, Tivette Smith, David Lisbon and Charlesetta Holland. Smith testified that she did not know whether the defendant had been the shooter, and that she had told the police that she did not know. She had told her sister that the defendant had shot the victim but only because others had stated that this was the case. Lisbon testified that the defendant was *not* the shooter and that he did not remember telling the police otherwise. Only Holland identified the defendant at trial, and she had been drinking beer prior

to the shooting and had given an incorrect description of the defendant to the police. As the state concedes, the defendant called four witnesses who had seen the shooting and who had given descriptions to the police that were inconsistent with the defendant being the shooter. In addition, the defendant presented an eyewitness who testified specifically that the defendant was not the shooter.

I believe the improper and prejudicial comments of the prosecutor require a reversal of the defendant's convictions and a new trial.

I respectfully dissent.